**MOBIL OIL CREDIT CORPORATION, Appellant,**

v.

**DST REALTY, INC. & Stephen D. Dunn, Respondents,**

**DST REALTY, INC. & Stephen D. Dunn, Respondents-Cross Appellants,**

v.

**MOBIL OIL CREDIT CORPORATION, Appellant-Cross Respondent.**

**No. WD 35756.**

Missouri Court of Appeals, Western District.

Feb. 5, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 2, 1985.

Application to Transfer Denied May 29, 1985.

John M. Kilroy, Jr., William E. Quirk, Shughart, Thomson & Kilroy, and Wayne E. Mullins, Mobil Oil Credit Corp., Kansas City, for appellant.

Duane J. Fox, Paul G. Schepers, Burrell, Seigfreid & Bingham, P.C., Kansas City, for respondents.

Before LOWENSTEIN, P.J., and SOMERVILLE and NUGENT, JJ.

LOWENSTEIN, Presiding Judge.

█ The single issue in this court tried case is, where a commercial lease is silent, which party is to pay for newly discovered latent and substantial repairs, structural in nature, the landlord or the tenant? Inapplicable is the implied warranty of habitability as recognized in *King v. Moorehead,* 495 S.W.2d 65 (Mo.App.1973), as that rule is only applicable to residential property. *Detling v. Edelbrock,* 671 S.W.2d 265, 270 (Mo. banc 1984).

On August 1, 1980 Mobil Oil Corporation (referred to as Mobil or the tenant) entered into a ten-year lease on an entire eight story office building, the lower three floors of which comprise a parking garage. The building is the Centennial Building located in downtown Kansas City. Mobil has used the premises as its national credit card center. In December, 1980 Mobil notified the then landlord and owner the concrete in the garage facility was cracking and spalling. Spalling basically occurs when the steel reinforcing bars over which the concrete is laid, become rusted by water and salt and expand, causing the concrete to pop or spall off the bars. Pursuant to an oral agreement, and so as to maintain a good landlord-tenant relationship, Mobil paid one-half of the $14,625.00 in repairs, although the landlord never claimed Mobil was responsible for the repairs under the terms of the lease.

In June, 1982 the landlord sold its interest and the lease was assigned to D.S.T. Realty, Inc., and Stephen D. Dunn (referred to as Downtown Investors or the landlord). Thereafter, Downtown Investors became aware that the garage was in extensive need of structural repair. Following demand letters in January and February, 1983, Mobil was forced under threat of forfeiture by Downtown Investors to contract to have the repairs performed. The project in question involved jackhammering and replacing 35 to 45 percent of the concrete surface in the garage, and sandblasting away corrosion on existing steel reinforcing bars, plus adding some two tons of new reinforcing bars. The parties stipulated the total cost and expense to the tenant Mobil came to $438,207.66.

Mobil sued Downtown Investors for the total amount, and the trial court decided that the lease was ambiguous, and so looked to the 1980 oral agreement between the original landlord and Mobil. Because the parties split the cost then, the trial court ordered Downtown Investors to pay half the current costs. Both parties appeal.

The lease is to expire in the year 1990, but has a renewal clause for another five years. Rent through 1985 is set at $350,000 a year plus Mobil is to pay an amount equal to taxes and to repay to Downtown Investors the cost of casualty insurance. Paraphrased, the following specific sections of the 38-page lease are pertinent in deciding which side is to pay for part or all the costs:

Section 308—Rent was intended to be on a net basis to the Lessor, "free from any taxes, assessments, expenses, or charges with respect to the Premise."

Section 402—Tenant shall be responsible for all costs of the building operation, building repair, painting, decoration and maintenance, except: (the two exceptions are that the Lessor will pay for roof renovation in excess of $60,000.00 and for exterior building repair in excess of $25,000.00).

Section 403—Lessee agrees to take good care of the premises and shall, at its expense, make all repairs to the premises and the equipment therein necessary to preserve them in good order and condition, ordinary wear and tear excepted.

Section 1105—Modifications. This Lease Agreement may be modified only by written agreement signed by Lessor and Lessee.

The evidence supporting the trial court's findings about the nature of the repairs was: the conditions causing the spalling started prior to Mobil's taking the lease, the repairs demanded by the landlord and made by the tenant constituted, "structural reconstruction of the Centennial Garage" and were "substantial and extraordinary in nature," which with the steel and new concrete added strength to the garage and restored "the integrity of the structure." Neither party knew the extent of the damage when the lease was drawn, and it appears neither the previous owners nor Mobil anticipated the repairs needed when the patching of the cracks was done in December of 1980 (where the $14,000 cost was split).

The court concluded Sections 402 and 403 were silent as to who should pay for substantial structural repairs to the garage, constituting an ambiguity as to which side had the obligation, so under *Latimer Motors, Ltd. v. McIntosh Motors, Inc.,* 512 S.W.2d 875, 880 (Mo.App.1974), the contract would be construed as understood and acted upon by the parties. The trial court concluded the 1980 repairs of $14,000 had been shared equally and since those were "substantial" repairs, the present costs of $438,207.66 should be so treated.

■ There was no substantial evidence to support the conclusion patchwork of

1980 constituted substantial or structural repairs. The enormity of the problem was not apparent in 1980, and this court will not conclude the payment of one half those costs by Mobil to a previous landlord, would obligate the tenant to pay one half, or any of the costs herein encountered. Also, the conclusion that an ambiguity exists cannot be sustained. This misapplication of the law calls for a reversal. "Language is ambiguous when it is susceptible of opposite meanings." *Latimer, supra,* at 880. The issue of ambiguity is one of law, but, "[A] provision is ambiguous only when it is reasonably susceptible of different constructions and not by the fact that the parties do not agree on its construction. The court should not resort to construing an unambiguous provision." *Republic National Life v. Missouri State Bank,* 661 S.W.2d 803, 808 (Mo.App.1983). An ambiguity cannot be created by silence. In *Latimer* there were two conflicting provisions dealing with destruction by fire. Here, there was no provision for structural repairs for the parking garage. The other portions of the lease defining a "net" lease, or the agreement by Mobil to pay for roof damage cannot be used to create a promise to make the present repairs. *Bogan v. Postlewait,* 130 Ill.App.2d 729, 265 N.E.2d 195, 197 (1970).

*Latimer, supra,* further points out the law which holds a tenant is not responsible for substantial or structural repairs unless he clearly covenants to do so. *Id.* at 881. The clause in *Latimer,* "to comply with all laws," and the clause in *Thomas W. Garland, Incorporated v. Rubin,* 493 S.W.2d 74, 76 (Mo.App.1973), "to keep the premises in good order and repair," do not create a duty for structural repairs to be made by the tenant. *Garland,* it should be noted, was decided on the basis the repairs were not of a structural nature, so the tenant there lost.

■ The landlord's argument of this being a net lease, and that such a concept subsumes the tenant paying all the taxes, insurance and maintenance, and that maintenance includes everything from cleaning smudges to jackhammering the parking structure, is fallacious. This attempts to

create a legal effect in the lease because of what it is called rather than what it does. *Levitz Furniture Co. v. Continental Equities*, 411 So.2d 221, 224 (Fla.App.1982). Unless there is some inherent duty in the tenant to make structural repairs, the provision in § 308 of this is a net lease will not be allowed to create such an obligation.

■ Basically a tenant cannot be held for substantial structural repairs unless it so specifically agrees in the lease. A general covenant of a tenant to make ordinary repairs does not require him to make structural repairs. *Hardy v. Montgomery Ward & Co.*, 131 Ill.App.2d 1038, 267 N.E. 748, 751 (1971). In the *Restatement (Second), Property* (Landlord and Tenant) § 13.1, comment c. (1977) states:

A promise by the tenant to keep the leased property in repair, unless the language of the promise clearly provides otherwise, does not obligate the tenant to make repairs other than those that are the result of ordinary wear and tear on the leased property.

In order to shift the burden to the tenant of what would naturally fall on the landlord there should be something specific in the lease. *Kaufman v. Shoe Corporation of America*, 24 Ill.App.2d 431, 164 N.E.2d 617, 620 (1960). The *Restatement, supra,* in Section 5.6, comment d. holds:

Rule of construction applicable to agreement. An agreement, express or implied, which undertakes to decrease a landlord's obligations in regard to the condition of the leased premises, will be construed strictly against the landlord. In other words, the extent of the decrease will be kept in as narrow a range as is consistent with the terms of the agreement entered into by the parties.

Illustration 1 to comment d. *supra,* provides:

The extent to which the promise shifts the responsibility for the condition of the premises to the tenant from what it otherwise would be is to be given a strict interpretation. If a more extensive shift is intended, it is the responsibility of the landlord to spell this out in the agreement between the parties.

*Reed v. Classified Parking System*, 232 So.2d 103, 107 (La.App.1970).

■ The trial court's finding of the present repairs being structural and substantial would be enough to carry the day for the tenant. In addition the repairs were so unforeseen and so substantial it would be unreasonable to expect the tenant to make them when the benefit of having the structural integrity restored would be the landlords. *Baxter v. Ill. Police Federation*, 63 Ill.App.3d 819, 20 Ill.Dec. 623, 626, 380 N.E.2d 832, 835 (1978).

This being a 10-year lease with rent being $350,000 and then $400,000 after 1985, it would be unfair to make the tenant pay over $438,000, or even one half just to enjoy using the building until 1990. The *Restatement, supra,* in Section 5.5, comment f. states:

Implied promise by landlord to repair. Where it would not be reasonable in light of the term of the lease, the rent that is being paid, the purposes for which the leased property is used, and other circumstances, to expect the tenant to assume the cost of major repairs to the leased property that become necessary through no fault of the tenant, a conclusion is justified that the landlord impliedly promised to make those major repairs.

The situation here is analogous to *Second United Cities Realty Corp. v. Price & Schumacher Co.*, 212 N.Y. 120, 151 N.E. 150 (N.Y.App.1926) where the court said at page 151–152:

Why should the tenant pay for this? The clause of its lease did not require the tenant to make structural changes or to pay for rebuilding. The rent of the store was only $600 for a term of three years. The cost of these repairs or reconstruction equals within a few dollars the amount of the three years' rent. That such a liability was to be cast upon by the tenant by this lease could hardly have been within the contemplation of the parties.

*Cohen v. Bass,* 246 N.Y. 270, 158 N.E. 618, 620 (N.Y.App.1927). The following lan-

guage in *Scott v. Prazma*, 555 P.2d 571 (Wyo.1976), is also here appropriate.

Such a position is obviously unfair because it would give plaintiff a better, fully reconstructed building than the lease, the life of which improvements would extend far beyond the defendant's remaining term of less than eight years. It would become far superior to its condition at the date of the lease. By the express terms of the agreement, defendant's obligation was only to keep it in its lease-date condition. It had taken over 30 years for the building to reach its present dilapidated state. Patching was no longer feasible for major items; reasonable wear and tear had taken its toll. The leasehold is worthless if the lessee cannot occupy the premises.

*See, Restatement, supra,* Section 12.2 comment e.

The misapplication of the law holding the tenant Mobil was responsible for one-half the repairs calls for reversal. The case reversed and remanded to enter judgment in the full amount for Mobil on its petition.

All concur.