Barry T. SHAPIRO, Trustee Under Revocable Trust Agreement, and Andrea Lou Weiner, Grantor, Plaintiffs–Appellants/Cross–Appellees,

v.

VALMONT INDUSTRIES, INCORPORATED, Defendant–Appellee/Cross–Appellant.

Nos. 91–3642, 91–3734.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1992.

Decided Dec. 29, 1992.

---

**238**

Michael R. Kramer, Eric S. Rosenthal (argued), David Hart, Kramer Mellen P.C., Southfield, MI, James P. Hayes, Holmes & Hayes, Plymouth, IN, for plaintiffs-appellants/cross-appellees.

Gerald F. Lutkus, Barnes & Thornburg, South Bend, IN, James E. Fitzgerald, Robert Bothe (argued), James J. Niemeier, McGrath, North, Mullin & Kratz, Omaha, NE, for defendant-appellee/cross-appellant.

Before POSNER and FLAUM, Circuit Judges, and ZAGEL, District Judge.[1]

ZAGEL, District Judge.

This lawsuit centers on the interpretation of a commercial lease. The plaintiffs, referred to here generally as "Shapiro," subleased a commercial property to Valmont Industries, Inc. The parties cannot agree on the extent to which the sublease obligates Valmont to perform deferred maintenance and repairs on the property. Here and in the district court both parties staunchly maintain that the language of the disputed sublease is unambiguous. Because we conclude that the district court adopted the better of the two interpretations of the sublease advanced by the parties, we affirm.

I.

Shapiro owns the real property that is the subject of this diversity suit. The property is a manufacturing facility located in Bremen, Indiana. There are about twenty buildings on the premises. In 1984, Shapiro subleased the property to Valmont for a 5-year period. Valmont took the property subject to the terms of a prime lease, which required Valmont to keep the property in good order and repair and to make all necessary repairs of every kind. The sublease itself contained a surrender provision requiring Valmont to return the property "in substantially the same condition as received, ordinary wear and tear excepted."

The disputed provision is the Addendum to the sublease. It imposed additional obligations upon Valmont concerning maintenance, repair and renovation of the property. The Addendum says:

> Lessor hereby credits Lessee in the amount of $20,000.00 against the first rent owing under the Sublease to cover deferred maintenance and repairs. Lessee shall bear any costs for deferred maintenance and repairs in excess of $20,000.00 and Lessee agrees to perform the deferred maintenance and repairs listed on Exhibit 'A' attached hereto forthwith.

1. The Honorable James B. Zagel, of the Northern District of Illinois, sitting by designation.

Exhibit A listed certain roof repairs and also required Valmont to take responsibility for "all other repairs including but not limited to repairs and renovations to fire sprinkler system."

After leaving the premises in 1989 Valmont received notification that Shapiro believed Valmont had failed to fulfill its obligation to maintain and repair the property. Valmont countered that it had done what it contracted to do, including roof repairs and renovation of the fire sprinkler system. Their differences unresolved, Shapiro filed suit in March 1990.

Valmont sought summary judgment on the issue of its maintenance and repair obligations under the sublease. In its motion, Valmont asserted that the sublease only required it to return the premises at expiration of the sublease in substantially the same condition as received, and that it had satisfied those obligations. Shapiro opposed the motion contending that the sublease required Valmont to perform any and all deferred maintenance immediately upon taking possession of the property, and thereafter maintain the property in good repair.

The district court granted partial summary judgment to Valmont. Except for the deferred maintenance and repairs specifically listed in Exhibit A of the Addendum, the judge found the sublease could not reasonably be read as placing upon Valmont the obligation to provide substantial improvements to Shapiros' property, the defects of which were extensive. The relatively short term of the sublease figured large in Judge Miller's conclusion that the "including but not limited to" language of the Addendum was not an explicit enough expression of intent on which to hold Valmont responsible for fixing a long list of defects that pre-existed the sublease. The court held that other than the deferred roof and sprinkler system repairs, the lease only required Valmont to surrender the property in substantially the same condition as received, ordinary wear and tear excepted. The district court refused Val-

mont summary judgment as to whether it had fulfilled those obligations.

After a bench trial, Judge Miller found that Valmont had satisfied its repair and maintenance obligations save those relating to the fire sprinkler system. The court awarded Shapiro $80,000 for the cost of reconstruction of the fire sprinkler system.

Shapiro appeals the district court's grant of partial summary judgment to Valmont and that portion of the court's verdict holding that Valmont had met its maintenance and repair obligation with respect to the galvanized quonset hut located on the property. Valmont cross-appealed the determination that the lease required Valmont to repair the entire fire sprinkler system. We consolidated these appeals.

## II.

■ Both parties have always said that the sublease at issue is unambiguous. But Shapiro and Valmont do not agree on the meaning of the sublease's supposedly unambiguous language. Under Indiana law, which the parties agree governs the interpretation of the sublease, the construction of an unambiguous contract is a matter of law for the court. *Scott v. Anderson Newspapers, Inc.*, 477 N.E.2d 553, 559 (Ind.App. 4 Dist.1985). The parties urged their respective interpretations on the district court and the court favored Valmont's interpretation.

Although one could disagree with the premise that the language of the sublease is unambiguous, this Court is not the one to do so. Any claim that the sublease is ambiguous is waived. Perhaps the district court could have disagreed with both parties and found ambiguity but it was not obliged to do so. Faced with divergent interpretations of an assertedly unambiguous contract, it was within the court's discretion to decide which of the two interpretations was better. Like an arbitrator in a "last best offer" arbitration who selects one final offer rather than constructing a compromise award,[2] Judge Miller was allowed to choose the better of two interpretations of the sublease. He did just that.

**2.** Michael Finch & Trevor W. Nagel, *Collective Bargaining in the Public Schools: Reassessing* *Labor Policy in an Era of Reform,* 6 Wis.L.Rev. 1573, 1628–29 (1984).

Shapiros' construction of the sublease requires that the term "deferred maintenance and repair" include all deferred repair necessary to put the property in a substantially improved condition, and then a continuing obligation to maintain the property in good repair for the remainder of the tenancy. Judge Miller considered this interpretation unreasonable in the context of a 5–year lease that provided only a $20,000.00 rent credit to cover deferred maintenance and repair on a property with numerous defects that pre-existed the sublease. We agree.

The Addendum and Surrender provisions of the sublease are in tension. The former provides that Valmont should perform deferred maintenance and repairs "including but not limited to" certain roof repairs and renovations to the fire sprinkler system. The latter states that Valmont was to surrender the premises "in substantially the same condition as received, ordinary wear and tear excepted." The district court recognized and resolved this tension by giving effect to those obligations of deferred maintenance that were truly express: roof repairs and fire sprinkler system renovation. Otherwise, the surrender provision's mandate governs Valmont's obligations. This result does not render the Addendum's deferred maintenance provisions a nullity, as Shapiro suggests. Rather, consistent with well settled principles of contract construction, it harmonizes language in the Addendum and Surrender clause that would otherwise conflict. *First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind.1990). And unlike Shapiros' attempt to resolve this conflict, the district court's interpretation comports better with other key provisions of the sublease, like its 5–year term and $20,000.00 rent credit.

Shapiro relies heavily on *Mobil Oil Credit Corp. v. DST Realty, Inc. et al.*, 689 S.W.2d 658 (Mo.App.1985) to bolster its

case. Shapiro contends, and we agree, that the principle enunciated in *Mobil Oil* is that when a landlord seeks to place extraordinary obligations on a tenant, the tenant should be held only to those obligations that it has expressly assumed. Here, application of that principle works against Shapiro. The issue in *Mobil Oil* was whether a tenant should be held responsible for substantial structural repairs under a 10–year commercial lease. The lease contained a general provision placing the obligation for repairs on the tenant, but contained no provision governing substantial structural repairs. *Mobil Oil*, 689 S.W.2d at 659. The court held that "[a] general covenant of a tenant to make ordinary repairs does not require him to make structural repairs." *Id.* at 660.

The holding in *Mobil Oil* rests on essentially two grounds. The first is a rule of construction which holds that an agreement "which undertakes to decrease a landlord's obligations in regard to conditions of the leased premises, will be construed strictly against the landlord." *Id.* at 661. The second is the court's conclusion that it would be unreasonable to construe the lease in the landlord's favor given the high cost of the repairs sought, the amount of rent being paid and the lease's relatively short 10–year term. *Id.*

Here, the "including but not limited to" language in Exhibit A of the Addendum is akin to the general repair provision in *Mobil Oil*. It is not sufficiently specific to saddle Valmont with the onerous deferred maintenance obligation that Shapiro says it does. It should therefore be construed against Shapiro. And, as in *Mobil Oil*, Shapiros' interpretation is further weakened when the cost of the deferred repairs is considered in relation to the amount of rent Valmont paid and the short 5–year lease term.[3]

Notwithstanding Shapiros' contrary assertions, the decisions in *Capitol Funds, Inc. v. Arlen Realty, Inc.*, 755 F.2d 1544

---

**3.** Valmont paid $300,000.00 a year or $1.5 million over the 5–year lease term. Valmont contends that the deferred repairs for which Shapiro seeks recovery would cost $1.9 million. Counsel for Valmont stated at oral argument that the $1.9 million figure came from a report

prepared by an architectural engineering firm hired by Shapiro. The report was introduced into evidence by Shapiro at the summary judgment hearing but not at trial. Although Shapiro has since backed away from its own expert's conclusions, the $1.9 million figure remains the

(11th Cir.1985) and *In re D.H. Overmeyer Co., Inc.*, 12 B.R. 777 (Bankr.S.D.N.Y. 1981), *aff'd*, 30 B.R. 823 (S.D.N.Y.1983), do not aid its cause either. Both courts held that the tenants were required to replace several items on the subject properties at the commencement of the respective lease terms, and thereafter maintain the properties in good repair. The leases in both *Capitol Funds* and *Overmeyer*, however, expressly required the tenants to *"put, keep, replace and maintain* [the properties] in thorough repair and good condition ..." *Capitol Funds*, 755 F.2d at 1545; *Overmeyer*, 12 B.R. at 786 (emphasis added). An express agreement to "put" a property in good repair creates a generalized and affirmative duty of restoration that is absent in the sublease signed by Shapiro and Valmont. In addition, *Capitol Funds* and *Overmeyer* involved long-term commercial leases of 20 years. Given the explicit lease requirements and long-term nature of the leases, *Capitol Funds* and *Overmeyer* are not sufficiently analogous to lend substantial support to Shapiros' interpretation of the sublease at hand.

### III.

■ At trial the court found that the quonset hut was in substantially the same condition at the time of surrender as it was when Valmont took possession of the property in March 1984, ordinary wear and tear excepted. Shapiro seeks reversal, contending that the finding is not supported by the evidence.

The finding concerning the quonset hut hinges on the trial court's assessment of oral testimony. After observing all the witnesses, Judge Miller concluded that Valmont's site manager, Ronald Hanson, was most credible. Mr. Hanson was the only witness who saw the property at the beginning and end of the sublease term, and Judge Miller noted that he answered questions in a straightforward manner regardless of who asked them. Apart from Mr. Hanson's testimony, all of the evidence presented as to the condition of the hut was

indirect and, in the court's words, not "sufficiently persuasive to outweigh Mr. Hanson's testimony." The district court stated: "Mr. Hanson testified that [the quonset hut] showed no major rusting when Valmont vacated the premises." Shapiro asserts that Mr. Hanson never made such a statement at trial and, therefore, the court's decision should be reversed because it was based on evidence never presented at trial. Regardless of whether Mr. Hanson uttered those exact words the thrust of his testimony on which the trial court relied is this: the buildings on the premises were in substantially the same or better condition at the end of the sublease term than at the beginning. Judge Miller recounted that testimony in his verdict and Shapiro does not challenge its presence in the record.

In view of the entire record, we find no error in the district court's conclusion that Valmont fulfilled its repair and maintenance obligations with respect to the quonset hut.

### IV.

■ Valmont's cross-appeal contests the assessment of damages in the amount of $80,000.00 to cover reconstruction of the fire sprinkler system. The $80,000.00 judgment against Valmont represents the estimated cost of repair of the entire fire sprinkler system. Valmont argues there is reversible error because the sublease obligated Valmont to repair and renovate only part of the sprinkler system.

The fire sprinkler system has three separate sections. Each section can be operated independently of the others. One section is in that portion of the property that Valmont occupied. The other two sections were in areas that were occupied by two other companies, Win–Tec and Flexible Foam, who made rental payments to Valmont. At the commencement of Valmont's sublease, only the Win–Tec section worked. The Flexible Foam section was frozen. The remaining section was inoperable due to pipes missing in several buildings. The

only estimated cost of deferred repairs in the record. Perhaps Valmont's annual rent was substantially below market thus making Shapiro's construction of Valmont's deferred mainte-

nance obligation more plausible. But that argument was not advanced and nothing in the record supports it.

district court held that the term "deferred maintenance and repairs" in the Addendum, which specifically listed "repairs and renovations to fire sprinkler system," meant repair and renovation of the entire system and not merely the Flexible Foam section, as Valmont contends.

As to fire sprinkler system renovation, the sublease satisfies the specificity requirement articulated in *Mobil Oil*. There is no tension here between the obligations conferred upon Valmont in the Addendum and its simultaneous duty to surrender the property in "substantially the same condition as received ..." This is because Valmont's obligation to repair and renovate the fire sprinkler system is specifically enumerated. It is an unambiguous contractual duty to improve and then maintain the sprinkler system. And that duty is not contained in a general repair provision or an attenuated "including but not limited to" clause. Rather, Valmont's obligation to repair and renovate the fire sprinkler system is express.

Valmont makes much of the fact that the Addendum's Exhibit A and the receipt Valmont submitted for repair of the Flexible Foam section refer to the fire sprinkler "system," in the singular, and not "systems," in the plural. According to Valmont, this suggests that the parties never intended Valmont's deferred repair duties to go beyond the one section of the system that Valmont did repair, the Flexible Foam section.[4] Yet Valmont's grammar hardly proves the point. Viewed in isolation, the word "system" is just as easily construed to mean the entire sprinkler system or one of its three sections. And, significantly, when read as an integrated whole, as they should be, nothing in the Addendum or Exhibit A suggests that the parties intended to limit or qualify Valmont's deferred repair duties concerning the fire sprinkler system. As the district court aptly noted, the sublease does not say that Valmont must repair a particular section or only a portion of the entire system; it requires Valmont to take "full responsibility" for

repair and renovation of the fire sprinkler system, without limitation.

Finally, Valmont points to the $20,000.00 rent credit as evidence of the parties' intention to limit Valmont's obligation to repair of the Flex Foam section only. Shapiro, of course, does not subscribe to this view. More importantly, the language of the Addendum refutes it. Through the Addendum, Valmont assumed responsibility for the cost of deferred maintenance and repairs in excess of $20,000.00. Valmont is not relieved of this obligation simply because the rent credit was granted in connection with Valmont's repair of the Flexible Foam portion of the sprinkler system.

We agree that Valmont was responsible to repair and renovate the entire fire sprinkler system and affirm the district court's $80,000.00 judgment against Valmont.

For the foregoing reasons, the decision of the district court is

AFFIRMED.

---

**4.** That Valmont's interpretation of the word "system" is unduly cramped is demonstrated by Valmont's own expert, Jack Hawk. After conducting an inspection of the premises, Mr. Hawk wrote a report that referred to multiple sections of the sprinklers as a "Fire Sprinkler System."