[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The following constitutes the court's findings of facts and conclusions of law.
I. FINDINGS OF FACT
1. On April 15, 1969, Harwin, Inc. ("Harwin"), as lessor, and Hart Twin Volvo Corp. ("Hart Twin"), as lessee, entered into a five year lease (the "Lease"), with three five year extensions, for property known as 168-176 Burnside Avenue, East Hartford, Connecticut (the "Property").
2. The Lease required Hart Twin as follows:
 8. To pay the rent and all other charges herein provided in the manner aforesaid; to pay all charges for water, fuel, electricity, gas, heat, CT Page 7754-I replacements of plate, door, window and any other glass, whether interior or exterior, which shall be broken; to maintain the demised premises and to make any and all repairs to the demised premises whether interior or exterior; to maintain and to make any and all repairs to the sidewalks and the approaches to the leased premises; and to remove all snow, ice and debris from the sidewalk and paved areas adjoining the premises to the street.
* * *
 14. That it will at the expiration of the said term, or other termination of this lease, quit and surrender the premises hereby demised in as good state and condition as reasonable use and wear thereof will permit, damage by fire or other casualty excepted; and that it shall at the expiration of the said term, or other termination of this lease, remove all fixtures and repair any damage to the demised premises arising from said CT Page 7754-J removal.
3. Thereafter, Harwin and Hart Twin amended the rental sum set forth in paragraph 3 of the Lease by a Modification of Lease dated April 14, 1970 (the "Modification"). The Modification provided, in pertinent part, as follows:
 WHEREAS, the parties hereto wish to modify and amend the rental for said premises as set forth in paragraph 3 thereof,
* * *
IT IS, THEREFORE,
 in consideration of the premises, the mutual promises of the parties hereto, the Lessor's forgiveness of the Lessee to pay a percentage of gross sales as called for in said lease, the Lessee's agreement to increase the yearly rental called for in said lease, and other valuable CT Page 7754-K considerations, agreed that said paragraph 3 of said lease shall be modified and amended as follows (all other covenants and agreements contained in said lease to remain in full force and effect and unchanged):
 3. Yielding and paying therefor as rent for said term of five (5) years the yearly sum of FORTY-EIGHT THOUSAND ($48,000.00) DOLLARS payable in monthly installments of FOUR THOUSAND ($4,000.00) DOLLARS on the 15th day of April, 1970. In addition to said rental, the Lessee shall become and be responsible for all the expenses connected with the demised premises, including without limiting the same to taxes, fire insurance, liability insurance, repairs and maintenance to the structure and its heating, plumbing, air conditioning and electrical systems, assessments, snow removal, etc. so that said rental payments shall be net to the Lessor.
(emphasis supplied). CT Page 7754-L
4. On or about October 18, 1974, effective August 15, 1974, Transit, Inc. ("Transit"), a predecessor to Clayton Motors, purchased the stock of Hart Twin. At the time of the purchase, Transit assumed and guaranteed all of Hart Twin's obligations under the Lease.
5. The building at the Property was built in 1946 and was 28 years old at the time Clayton Motors took possession in 1974.
6. At the time of the purchase of Hart Twin by Transit, Hart Twin was in severe financial trouble, on the verge of insolvency, and "out of trust with respect to several vehicles on its floor plan" with the Connecticut Bank and Trust Company.
7. According to Harold Winer, President of Harwin, the building had undergone $250,000 of renovations in 1969 as the result of a fire. No corroborating evidence of these renovations was offered by the plaintiff. However, according to Lawrence Rustin, Transit's accountant who conducted the negotiations for Transit, the following problems existed at the time negotiations CT Page 7754-M for the purchase of Hart Twin began in late July or early August 1974:
 a. the roof leaked in the office, main showroom and main garage areas;
 b. the walls and wall plaster showed signs of water damage, were stained and required paint;
 c. the soffits and eaves in the overhang outside of the showroom area were rotten and damaged;
d. electrical wires were loose and hanging;
 e. windows were popping out of their frames and some were boarded up;
 f. window frames were damaged and required repair in the body shop and upstairs storage areas;
g. doors to the showroom were off of their hinges and CT Page 7754-N did not fit;
h. doors were missing hardware;
 i. the body shop overhead doors were in poor condition;
j. the upstairs storage room was charred by a fire;
 k. the automobile lifts were in need of extensive repairs;
l. part of the garage floor was sinking;
 m. the heating and air conditioning systems were not operable in the small showroom and waiting areas and the oil burner required repair.
 n. the parking lot was in useable condition although it showed signs of cracking and potholes.
8. Although some of the foregoing problems were addressed on CT Page 7754-O a punch-list prepared by Mr. E. Clayton Gengras, Sr., President of Transit, many of these problems persisted up to and including the effective date of the agreement on August 15, 1974 and the date the agreement was signed on or about October 18, 1974.
9. Although Mr. Winer testified that the Property was in the condition of a new auto agency, the evidence demonstrates that there were persistent, ongoing problems with the leaking roof dating at least to 1974, when Transit assumed the lease.
10. Both the parking lot and the interior and exterior of the building were in varying states of disrepair in 1974.
11. Because the business required an immediate infusion of capital, Transit began operating the dealership on August 15, 1974. It closed the deal on October 18, 1974, despite the condition of the Property and against Mr. Rustin's advice because Mr. E. Clayton Gengras, Sr. considered the Volvo franchise and underlying goodwill of the business to be valuable assets.
12. Transit paid ACMAT to refurbish the showroom area. In addition, Clayton Motors repaired the lifts, exhaust systems and CT Page 7754-P replaced glass. The roof continued to leak, however, and glass windows continued to pop out of their frames.
13. At the time of the purchase of Hart Twin by Transit, Mr. Rustin prepared a trial balance showing leasehold improvement expenditures made by Hart Twin. The trial balance was prepared from records which were made available to Mr. Rustin by Mr. Winer. It shows that between April 15, 1969 and August 15, 1974, Hart Twin made $5,080.03 in leasehold improvements to the Property.
14. Between August 15, 1974 and December 1983 Clayton Motors made leasehold improvement expenditures in the amount of $75,000.
15. Additionally, the available financial records for Clayton Motors for the years ending 1974, 1975, 1982 and 1983 also show that, separate and apart from any leasehold improvement expenditures, Clayton Motors made approximately $55,000 in expenditures for repairs and maintenance to the Property in those years.
16. After 1983, however, Clayton's expenditures for leasehold CT Page 7754-Q improvements and maintenance and repair declined significantly. This decline coincides with Clayton's 1985 sublease of the premises to another car dealership.
17. From the inception of Transit's assumption of the lease in 1974 there existed ongoing problems with the roof. These problems were identified by Mr. Rustin in 1974. In 1976 Clayton Motors withheld three (3) months rent because of the leaking roof. As a result, Harwin sued Clayton Motors on April 8, 1976.
18. The lawsuit was settled less than two (2) months later when Harwin agreed to pay for repairs to the roof by allowing Clayton Motors an allowance of $5,500.00, in the form of a reduction of the rent, to be used to repair the roof and remodel the showroom windows.
19. Mr. E. Clayton Gengras, Jr., President of Clayton Motors, first began working for Clayton Motors in 1976 as the General Manager.
20. The Property at that time had the following problems: CT Page 7754-R
a. the roof leaked and required patching;
 b. the windows in the showroom area tended to pop out of their frames and shatter;
 c. the Property was infested with termites requiring Clayton's exterminator to drill holes in the showroom floor to properly treat the problem. Nevertheless, the termite infestation caused the window casings to weaken, resulting in the ongoing damage to the showroom windows.
d. the plumbing was backing up; and
 e. the parking lots had cracks and potholes which required patching.
21. The available records show the following expenditures made by Clayton Motors to maintain and repair the Property: CT Page 7754-S
Pest Control (termites and cockroaches) approx. $2,704.66 (December 1977 — August 1985)
Glass Replacement approx. 16,829.03 (January 1978 — December 1981)
Electrical (including repair of approx. 3,207.14 defective system as well as upgrading for convenience) (January 1978 — March 1985)
Reconstruction of Service Area 3,353.90
Repair of Auto Lifts 565.00
Miscellaneous 584.00 ---------- TOTAL $27,243.73 =============
22. The roof is a flat composition tar and gravel roof. It CT Page 7754-T was in a condition that required regular attention. It leaked from the beginning of the Lease and subcontractors were hired to undertake repairs from time to time. Clayton Motors' custodial employees also patched and repaired the roof as was necessary.
23. The interior of the Property was painted in 1978 and, with few exceptions, has not required paint since that time. The showroom area is predominantly glass and the rear wall of the showroom is covered with vinyl wallpaper. The garage and service areas are concrete block construction and have no interior partitions.
24. The exterior of the building is predominantly constructed of brick. It was painted in sections on an as needed basis. At some time in the late 1970's or early 1980's, the entire exterior of the building was painted white. It has not been wholly repainted since that time.
25. The parking lot is paved with asphalt.
26. The parking lot has not been repaved since prior to Hart CT Page 7754-U Twin Volvo's tenancy in 1969.
27. The parking lot has had cracks and potholes since 1974. Every winter during the lease it was subject to freezing and thawing, resulting in the need for patching each spring and summer. Clayton Motors made these repairs at least once a year by hiring a crew who visited the Property with a dump truck full of hot patch.
28. In 1985, Clayton Motors moved its business to a newly constructed facility at 300 Connecticut Boulevard because it had outgrown the available space at the Property.
29. In March 1986, Clayton Motors subleased the Property to Century Yugo, Inc. and its successors (Hartford Mitsubishi, Capital Used Cars and Century Subaru). These subtenants were in physical possession of the Property and operated their automobile dealerships at the Property until July 1988. Notwithstanding the sublease, Clayton Motors remained responsible for the upkeep of the premises.
30. During the period of the sublease, Clayton Motors CT Page 7754-V purchased and installed a new furnace for the Property at a cost of $13,000.
31. Mr. Winer was satisfied that the Property was in satisfactory condition during the Yugo and Hartford Mitsubishi sub-tenancies which commenced in 1985.
32. During the period of the Lease from 1976 to 1989, including the period of the sublease, Mr. Winer periodically visited the Property. These visits occurred at least once a year and sometimes more often. The purpose of these visits was to inspect the Property. Mr. Winer never registered any oral complaints to Mr. Gengras when he visited the Property. With the exception of a 1979 letter and a lawsuit which was withdrawn without consideration or explanation, he never registered any complaints with respect to the condition of the Property until December 1988, only four months prior to the expiration of the Lease.
33. In addition, the Property was visited periodically by representatives of Volvo, Dodge and the State of Connecticut. CT Page 7754-W They did on-site evaluations and inspection. Clayton Motor never received any complaints regarding the appearance or upkeep of the Property at any time.
34. Mr. Winer visited the Property sometime in early 1989 but did not know when. He could not recall whether or not he visited the Property in April 1989.
35. In February 1989, Mr. Gengras walked the Property with Mr. Winer. At that time, the Property was in a state of uncleanliness, having been abandoned by Century Yugo seven months earlier. The Property was littered with trash and garbage. The interior required extensive cleanup and certain repairs to the ceilings, windows and heating and cooling systems.
36. Following the February 1989 visit with Mr. Winer, Clayton Motors cleaned up the Property. Employees of Clayton Motors visited the Property to clean up the trash and to get rid of the garbage.
37. In addition, prior to April 15, 1989, efforts and CT Page 7754-X expenditures totalling approximately $1,500 were made to repair the roof, replace the ceiling tiles, address the condition of the glass windows, and to address the heating, electric, plumbing and gas services.
38. With respect to the roof, it was leaking in the area where the back of the showroom abuts the front of the service area. The roof leaked in this area during the entire period of the Lease. National Roofing was engaged by Clayton Motors to patch the roof in that area so that it would not leak. National Roofing's representative was of the opinion that the building could use a new roof, which Clayton Motors did not believe it was responsible for.
39. With respect to the interior condition of the Property, Clayton Motors, prior to April 15, 1989, replaced the ceiling tiles, cleaned up the trash, and repaired the heating, plumbing, electric and gas systems. Clayton Motors did not paint the interior of the Property.
40. With respect to the exterior condition of the Property, CT Page 7754-Y Clayton Motors swept the surrounding grounds. The parking lots were not patched because it was too early in the year and the asphalt plants were not yet open.
41. Mr. Gengras obtained an estimate in the amount of $4,946.00 to replace the broken glass at the Property. He directed a letter to Mr. Winer requesting whether he would prefer a check in the amount of $4,946.00 in lieu of replacing the windows. Mr. Winer responded that he wanted the cash. Thereafter, Mr. Gengras directed a second letter to Harwin indicating that the ceiling tiles would be replaced, the lighting fixtures would be operable, and the water and heat would be turned on and in working condition. The letter further indicated that a check would be forwarded to Mr. Winer. Finally, the letter clearly expressed Clayton Motors belief that it had performed all of its obligations under the Lease and it invited Mr. Winer to respond if the Lease had not been complied with. Thereafter, a check was sent to Mr. Winer which he cashed. He never responded to the April 12, 1989 letter.
42. On April 17, 1989, Mr. Gengras directed a letter to Mr. CT Page 7754-Z Winer indicating that the plumbing and the furnace had been tested and were operating, and that all systems had been reconnected. Mr. Winer never responded to this letter.
43. Plaintiff's expert real estate appraiser visited the Property on February 14, 1989. He did not visit the Property on any other date. His appraisal, repair estimates, and testimony therefore represent only the condition of the Property as it existed on February 14, 1989, at the time of his visit.
44. Plaintiff's expert real estate appraiser made no effort to determine the condition of the Property on April 15, 1989 and he was not aware of any clean up or repairs made by Clayton Motors following his visit to the Property on February 14, 1989. He therefore did not consider these clean up and repair efforts in his appraisal of the condition of the Property, in his repair estimates, or in his testimony to the Court.
45. The repair estimates provided by plaintiff's expert real estate appraiser reflect the costs for a new roof, extensive interior remodeling (albeit not a total refurbishment or tenant CT Page 7754-AA fit out) and a new parking lot.
46. The effective age of the building at the Property in 1989 at the time it was reviewed by plaintiff's expert real estate appraiser was between 20 and 30 years. The actual age of the building was 43 years at the time of his review.
47. Flat composition tar and gravel roofs generally have a useful life of from 12 to 30 years. When they near the end of their useful life, they tend to leak and require patching. The roof on the building at the Property was at least 15 years old in 1989 and probably much older since it leaked from the outset in 1974.
48. An asphalt parking lot such as the one at the Property has a useful life of from 12 to 15 years, although some parking lots last longer. Plaintiff's expert real estate appraiser did not know when this parking lot was last repaved. Maintenance required on such a parking lot includes hot patch and sealing. The parking lot has not been repaved since prior to 1969 and therefore was at least 20 years old in 1989. CT Page 7754-BB
49. On or about April 17, 1989, after the defendant surrendered the premises, the exterior of the building and parking lot were inspected by the Town of East Hartford Housing and Property Maintenance Inspector. His April 19, 1989 letter to Mr. Winer instructed him to:
a. "Repair the exterior areas throughout the building and apply paint . . .";
b. "Repair the front overhang areas . . . and apply paint . . .";
c. "Repair the front areas under the showroom windows . . .";
d. "Repair or replace the roof throughout the building where rain water is entering the showroom office areas and garage . . .";
e. "Replace all broken or cracked window glass throughout the building as required . . ."; CT Page 7754-CC
f. "Clean and maintain the front sidewalks and paved areas . . . repair or replace the paved areas that are cracked, uneven or a ground surface hazard.
II. CONCLUSIONS OF LAW
1. Clayton Motors obligation with respect to the condition of the Property is set forth in paragraphs 8 and 14 of the lease. Clayton Motors was required:
 8. . . . to maintain the demised premises and to make any and all repairs to the demised premises whether interior or exterior; to maintain and to make any and all repairs to the sidewalks and the approaches to the leased premises; and to remove all snow, ice and debris from the sidewalk and paved areas adjoining the premises to the street.
* * *
14. . . . at the expiration of the said term, or CT Page 7754-DD other termination of this lease, quit and surrender the premises hereby demised in as good state and condition as reasonable use and wear thereof will permit . . .
2. The reference in paragraph 3 of the Modification of Lease to the tenant's obligation to "repairs and maintenance to the structure," does not impose on the tenant the obligation to replace structural items such as the roof and parking lot. Rather, it requires the tenant to maintain the structure and keep it in good repair.
3. In the absence of a specific covenant requiring the tenant to assume responsibility for substantial structural repairs or replacement of structural items the responsibility is that of the landlord:
 A promise by the tenant to keep the leased property in repair, unless the language of the promise clearly provides otherwise, does not obligate the tenant to make repairs other than CT Page 7754-EE those that are the result of ordinary wear and tear on the leased property.
Restatement (second), Property (Landlord and Tenant) § 13.1, Comment C., (1977), quoted in Mobil Oil Credit Corp. v. DSTRealty, Inc., 689 S.W.2d 658 (Mo.App. 1985).
4. The duty to maintain and repair "does not mean to make something new but rather to refit or restore an existing thing", excluding such work as "involves structural repairs or alterations". Ingalls v. Robert Smith Hotels Corp., 143 Conn. 1,7 (1955).
5. Clayton Motors is therefore not responsible for the costs of a new roof; a substantial remodeling of the interior; and a new parking lot. Id., 6-7. Paragraphs 8 and 14 of the lease only require the defendant to maintain and repair the premises.
6. To the extent that the April 15, 1989 condition of the Property was different from the August 15, 1974 condition of the Property, that difference is attributable, in large measure, to CT Page 7754-FF reasonable wear and tear, except as noted, infra.
7. Plaintiff's repair estimates and damage analysis itemizes the costs of significant structural repairs and capital improvements which, if completed, would bring the roof, parking lots, sidewalks and much of the interior of the building to a new condition — a condition of the Property was not in at the commencement of the lease term on August 15, 1974, or at any time thereafter.
8. Notwithstanding that it subleased the premises during the last four years of the lease term, the defendant remained responsible for repair and maintenance of the property.
9. "The question of the credibility of the witnesses is for the trier to determine. Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force is for the trier to determine. Moreover, a trier is certainly not required to believe testimony merely because it is not directly contradicted." State v. Madera, 210 Conn. 22, 37
(1989) (internal quotations and citations omitted). CT Page 7754-GG
10. "The trier may accept or reject the testimony of an expert, offered by one party or the other, in whole or in part."Smith v. Smith, 185 Conn. 491, 493 (1981).
11. The defendant and/or its sublessees [subleases] failed to maintain and repair the showroom windows, the sidewalk and parking lot and exterior of the building, as referenced in the April 18, 1989 letter to Mr. Winer from the Town of East Hartford Property and Maintenance Inspector.
12. The reasonable cost of the repairs necessary to replace the windows and restore the parking lot, sidewalk and exterior of the building to their 1974 condition, less reasonable wear and tear, is $15,000.
13. The defendant is entitled to a setoff of $4,946 which represents the amount of money accepted by the plaintiff in full satisfaction of any and all claims arising out of the damaged windows.
14. Plaintiff's claim for lost rental over the three month CT Page 7754-HH period required to perform the construction itemized by its expert real estate appraiser ($11,357 per month or approximately $34,000) is not recoverable because Clayton Motors is not responsible for the substantial improvements to be constructed over this three month period.
CONCLUSION
Based upon the foregoing proposed findings of fact and conclusions of law this Court enters judgment for the plaintiff in the amount of $10,054 plus costs.
The defendant's special defenses are overruled.
SO ORDERED.
Robert L. Holzberg, J.