**Daniel Preston MILLER, Joann O'Dwyer Revocable Trust and S. Carl Lensing, Appellants,**

v.

**GAMMON & SONS, INC., and Bill's Food, Inc., Respondents.**

**No. WD 58286.**

Missouri Court of Appeals, Western District.

Nov. 13, 2001.

Paul A. Seigfreid, Mexico, for appellants.

Duane E. Schreimann, Jefferson City, Terry Michael Gammon, Respondent Pro Se, Bates City, for respondents.

Before BRECKENRIDGE, P.J., ULRICH and HOWARD, JJ.

PATRICIA BRECKENRIDGE, Judge.

Daniel Preston Miller, the JoAnn O'Dwyer Revocable Trust and S. Carl

Lensing (Lessors) appeal the trial court's judgment which awarded them a portion of a month's rent under a commercial lease and denied their claims for the costs for repairs to the parking lot, prejudgment interest and attorney's fees. On appeal, they claim that the trial court erred in awarding only a portion of the monthly rental fee because the amount awarded by the court was clearly erroneous and unsupported by the evidence. Additionally, Lessors argue that the trial court erred in failing to award costs for repair to the parking lot because Bill's Food and Gammon & Sons, lessees, failed to maintain the parking lot in good condition as required by the lease. Lessors also argue that the trial court erred in failing to award statutory prejudgment interest for moneys due and payable under a written contract, because the damages were ascertainable based upon the contract rental price. Finally, Lessors argue that they should have been awarded attorney's fees because the contract provided for such.

This court affirms the trial court's judgment awarding a partial month's rent since the lease was terminated and the covenant to pay rent ceased on the termination date. Further, because the lease did not explicitly contain provisions for structural repairs, this court affirms the judgment denying Lessor's claims for the cost of repairing the parking lot. This court reverses, however, the judgment of the trial court with respect to prejudgment interest and attorney's fees and remands the case for further proceedings. Because the rental payments under the lease were fixed and ascertainable, prejudgment interest should have been awarded. Further, the court should have awarded attorney's fees based upon contractual provision for that portion of the attorney's fees associated with recovery of rent.

## Statement of Facts

On appeal, this court reviews the facts in the light most favorable to the trial court's judgment. *Morgan Publ'ns, Inc. v. Squire Publishers, Inc.*, 26 S.W.3d 164, 167 (Mo. App.2000). On August 26, 1991, Lessors, personally or through their predecessors in interest, entered into a lease of business premises with Bill's Food, Inc., as lessee. The subject of the lease was an Apple Market grocery store, including a parking lot, located in Fulton, Missouri. The terms of this original lease are not a part of the record on appeal. On June 27, 1995, Bill's Food assigned its interest in the lease to Gammon & Sons, Inc. Gammon & Sons assumed all rights, obligations and duties of Bill's Food as lessee under the lease. Under the Assignment of Lease, Bill's Food remained secondarily liable if Gammon & Sons failed to perform its obligations and duties.

Under the Assignment of Lease, the new terms of the lease with Gammon & Sons was for four years commencing on July 1, 1995, and terminating on June 30, 1999, with an option to renew for an additional term of five years. After the first renewal term, the lessee could renew for ten additional four-year terms. The lessee was required to pay $5,500 as monthly rental due on the first of each month. The lease stated that it was a "net-net-net lease," requiring the lessee to pay all taxes, assessments, and all costs and expenses relating to utilities, insurance, expenses of operation, maintenance and repair of the premises.

In early 1998, Gammon & Sons sent a letter to Lessors asking for assistance in anticipation of the opening of a Wal–Mart Super Center, which Gammon & Sons expected to affect their business. Gammon & Sons requested a 20% temporary reduction in rent to $4,400 per month from the

current $5,500. It also requested that Lessors repave the parking lot and apply new striping.

In response to this request, attorney for Lessors sent a letter to Gammon & Sons, indicating that the lease required it to maintain the property in as good condition as when they acquired the property. The letter also stated the following:

Because you believe that the building and parking lot need extensive repair and maintenance, we will look to you to perform these items in the very near future. Your failure to make needed repairs are elements of breach of your lease agreement. Please maintain the premises as required. We would like to conduct an inspection in the near future and will expect significant progress to be made on the repairs.

No response to the request for reduction in the rent was contained in the letter.

On March 22, 1998, Gammon & Sons surrendered possession of the premises without paying the rent due for March. On March 23, 1998, Lessors re-let the property to a new tenant. Lessors subsequently brought suit against Gammon & Sons and Bill's Food to collect the following: (1) $5,500 for rental due for the month of March 1998; (2) $17,500 for repair of the parking lot; (3) attorney's fees; and (4) prejudgment and postjudgment interest. Lessors alleged that Gammon & Sons and Bill's Food were in default for failing or refusing to perform their obligations as required by the lease agreement. Specifically, they alleged that Gammon & Sons and Bill's Food failed to pay rent on the first of the month for March 1998, and that they failed to maintain the parking lot in good condition, as required by the lease agreement.

Bill's Food filed its answer to Lessors' first amended petition in which it alleged that the lease had been terminated and, thus, Lessors waived any claim that they were attempting to assert under the terminated lease. Alternatively, it claimed that Lessors were "estopped to seek any recovery under the lease inasmuch as they have terminated the same." Bill's Food also alleged that the termination of the lease "result[ed] in the termination of any and all rights [Lessors] may be asserting thereunder and [Lessors] may therefore not seek any recovery under the lease." Finally, Bill's Food denied any responsibility for repairing or replacing the parking lot, asserting that any repairs needed were the result of reasonable wear and tear for which Bill's Food was not responsible. Bill's Food's also filed a cross-claim in which it sought a judgment against Gammon & Sons in the event that a judgment was entered against them and for Lessors. Bill's Food asserted that in the assignment of the lease, Gammon & Sons had "agreed to assume and make all payments and perform all covenants, obligations, and conditions of the lease" and Gammon & Sons agreed to indemnify Bill's Food.

In its answer to Lessors' first amended petition, in which it generally denied Lessors' allegations, Gammon & Sons included the affirmative defense that if any damages resulted from its failure to maintain or repair the parking lot, those damages should be offset against the $30,000 it spent for capital improvements to the building, to prevent unjust enrichment. In answering Bill's Food's cross-claim, Gammon & Sons admitted the allegations with respect to its assumption of the lease and agreement to indemnify Bill's Food.

On December 7, 1999, a bench trial was held in which much of the testimony concerned the maintenance of the parking lot. On December 15, the trial court entered a judgment for Lessors and against Bill's Food in the amount of $3,903.23 for twenty-two days of rent for March 1998. The

trial court also entered a judgment against Gammon & Sons on Bill's Food's cross-claim. Lessors appeal the trial court's judgment denying the full month's rent, costs for the repair of the parking lot, prejudgment interest and attorney's fees.

## Standard of Review

The standard of review in this case is established by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* The evidence, along with all reasonable inferences, are "viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App.2000). "[T]he trial court, as the trier of fact, determines the credibility of witnesses and may believe or disbelieve all or part of any witnesses' testimony." *Ken Cucchi Constr., Inc. v. O'Keefe*, 973 S.W.2d 520, 524 (Mo. App.1998).

## Rent

In their first point, Lessors claim that the trial court erred in failing to award them $5,500, the full amount of monthly rent for March 1998. They claim that the amount awarded by the trial court was clearly erroneous and unsupported by the evidence. Lessors contend that the twenty-two days used by the court to pro-rate the rent did not correspond with the admission of Gammon & Sons nor with the evidence at trial. They argue that under the lease the full monthly rental was due on the first of each month. Gammon & Sons failed to pay the rent on the first day of March 1998, and the rent remained unpaid at the time of trial. Thus, Lessors assert that the trial court should have awarded the full month's rent of $5,500.

It is undisputed that Gammon & Sons failed to pay the rent due on the first of March, 1998, and subsequently surrendered possession of the premises. There was evidence that the surrender occurred on March 22, 1998. The issue at trial and on appeal is how that surrender impacted the obligation of Gammon & Sons and Bill's Food to pay rent for the month of March. "Under Missouri law, upon a tenant's default, a landlord normally has three options: (1) the landlord can remain out of possession, treat the lease as subsisting and recover rent; (2) the landlord can give notice to the tenant, resume possession and attempt to mitigate the tenant's damages by re-letting the premises; or (3) the landlord can re-enter, resume possession in its own right and effectively terminate the lease." *WEA Crestwood Plaza, L.L.C. v. Flamers Charburgers, Inc.*, 24 S.W.3d 1, 7 (Mo.App.2000). If the landlord elects to terminate the lease, the lessee is released from covenants contained in the lease, including the covenant to pay rent. *See Crow v. Kaupp*, 50 S.W.2d 995, 998 (Mo. 1932). Generally, a landlord must give notice to the tenant if the landlord elects not to terminate the lease and intends only to resume possession of the premises in an attempt to re-let for the benefit of the tenant. *WEA Crestwood Plaza, L.L.C.*, 24 S.W.3d at 7.

Parties to a commercial lease, however, "may contractually agree to modify or eliminate certain notice provisions that would otherwise be required by either statute or common law." *Id.* at 8. In this case, the parties modified the general notice requirements by the terms of the lease. Under Section 3(j) of the lease, Lessors' resumption of possession and re-letting of the property only terminates the lease if Lessors give the lessees written

notice of Lessors' election to terminate. Section 3(j) reads that, upon the lessee's default:

> [T]he Lessor shall have the right to re-enter and take possession of the premises and the Lessee will peacefully surrender possession thereof to the Lessor upon written demand, and all rights and interests of the Lessee hereunder shall cease and terminate, but nothing herein contained shall affect the Lessor's right to the rental for the term herein specified. Upon taking possession hereunder, the Lessor may at Lessor's election terminate and end this lease and option by giving the Lessee written notice thereof, or the Lessor may re-let said property and the Lessee shall be liable for and will pay as it accrues, the difference in the rental for the balance of the term. . . .

Provisions concerning the right of reentry, as contained in this lease, have been held to give landlords a right to re-enter and re-let without "constituting an acceptance of [a] surrender," *Gruber v. Adler*, 600 S.W.2d 669, 672 (Mo.App.1980), and to create a presumption that "re-entry was not . . . a termination of the lease." *Collet v. Am. Nat'l Stores, Inc.*, 708 S.W.2d 273, 276 (Mo.App.1986). Thus, for this lease to be terminated, this presumption must be rebutted. To rebut the presumption, there must have been some written notice or other proof by Lessors of termination, as required by the lease.

■ The evidence relevant to whether Lessors elected to terminate the lease is a letter dated March 23, 1998, from counsel for Lessors to Gammon & Sons' attorney, in which he stated that "[m]y clients have assured me that they will not sign the termination of the lease agreement or the new lease agreement until such time as the payment of the property taxes have been made current." In that letter from counsel for Lessors, the only reference to rent due concerned one sentence, stating, "In addition, the terms of the lease have been violated by your clients repeatedly as they relate to payment of rent and repair of the premises." The closing paragraph stated, "Once I have received a paid tax receipt and verification from the Callaway County Collector that all taxes are current we will be in a position to proceed with the execution of the lease." At trial, counsel for Lessors informed the court that all taxes had been paid prior to the filing of the original petition. There was evidence that the new tenants took possession of the property on March 23, 1998.

In addition, Lessors have never asserted in this proceeding that they did not intend to terminate the lease. In their petition, they sought rent only for the month of March 1998, basing their claim on the fact that rent was due the first day of the month and was not paid on that date. The petition did not allege that the rent was due based upon the covenant to pay rent under the contractual liabilities under a lease that was in existence until June 30, 1999. Had there not been a termination, damages could have been sought based upon the continuing liability of Bill's Food and Gammon & Sons' under the lease. Thus, it is reasonable for the trial court to infer from the record that the termination was accomplished in accordance with the representations of Lessors' counsel in his letter.

■ Since the lease was terminated, Bill's Food and Gammon & Sons obligation for rent ended when the termination occurred. The issue, then, is whether the evidence supported the trial court's determination that Bill's Food owed only $3,903.23 in unpaid rent for twenty-two days of March 1998, because the lease was terminated on that date. This court finds that it does. The evidence in the light

most favorable to the judgment supports a finding that Gammon & Sons vacated the premises on March 22nd and the Lessors re-let to the new tenant on March 23rd. While Lessors asserted during oral argument that the new tenant did not take possession until April 1998, the record does not support this assertion. In fact, Mr. Miller, in his testimony at trial, answered affirmatively when asked if the property was re-let on March 23.

Furthermore, Lessors' argument that the finding was against an admission of Gammon & Sons is without merit. To support this assertion, Lessors cite Mr. Gammon's deposition testimony where he agreed that $4,000 was the approximate amount of outstanding rent for March 1998. Contrary to Lessors' argument, this statement does, in fact, support the trial court's determination that $3,903.23 was due under the lease. The amount assessed by the court was $96.77 less than the $4,000 estimate to which Mr. Gammon testified at his deposition. Furthermore, at trial, Mr. Gammon testified that the new tenant assumed possession on March 23, 1998. This court finds that the trial court's proration of the rent in its calculation of the amount due to Lessors is supported by the evidence. Lessors' first point is denied.

## Costs for Repair of Parking Lot

In their second point, Lessors claim that the trial court erred in failing to award costs of repair to the parking lot because Bill's Food and Gammon & Sons failed to maintain the parking lot as required by the lease. Lessors claim that under the lease, Bill's Food and Gammon & Sons were required to perform all maintenance at their expense and to surrender the premises in as good condition as received. Lessors claim that insufficient maintenance during the term of the lease resulted in damage to the parking lot.

Bill's Food does not dispute that it is responsible for ordinary maintenance of and repairs to the parking lot. It does dispute, however, that it is responsible for the "costs of repairs" requested by Lessors, which Bill's Food claims were unnecessary and provided no benefit to the parking lot. Bill's Food argues that the parking lot's condition was caused by the expiration of the natural life of the lot and not a lack of maintenance. Instead, Bill's Food claims that it is responsible only to return the premises, including the parking lot, in as good condition as received.

The parking lot, along with the building, was constructed in 1972. In August 1991, when Lessors entered into the original lease agreement with Bill's Food, the parking lot was nineteen years old and contained potholes and cracks. During the time in which Bill's Food was in possession of the premises, Bill's Food patched potholes each year. In 1993, Bill's Food hired a contractor to repave the portion of the parking lot directly in front of the store building. When Gammon & Sons took possession of the premises in 1995, Gammon & Sons continued to periodically repair potholes and cracks.

In June 1998, after Gammon & Sons had vacated the premises, Lessors spent $7,084 to reseal the parking lot. Lessors sought to recover that amount, plus $17,500 for an overlay needed to bring the parking lot to "good" condition as required by the lease.[1]

1. In their brief, Lessors state that the amount that they seek to recover is $7,084 for the costs of resealing the parking lot and $24,937.50 for an overlay, totaling $32,021.50. It is unclear how Lessors arrived at the $24,937.50 figure, except that it appears to be approximately the sum of the cost of resealing and the overlay as set out in Exhibit 9. Lessors' first amended petition stated that the cost of repairs was estimated at

They claim that, under the lease, Bill's Food is responsible for the costs of these structural repairs to bring the parking lot to good condition.

As a preliminary matter, this court must first consider whether the need for repairs was occasioned by a lack of maintenance. If so, then the resolution of this issue involves the question of maintenance and not structural repairs and would place responsibility for the costs on the lessee. *See Abuzeide v. Body of Christ Fellowship, Inc.*, 739 S.W.2d 759, 760 (Mo.App.1987). In addressing this issue, the question of whether Bill's Food and Gammons & Sons are responsible for the $7,084 for the resealing will also be considered.

■ Lessors asserted that the repair and maintenance work performed by Bill's Food and Gammon & Sons maintained the parking lot at the lowest level. They presented evidence that the periodic filling of potholes and cracks was not sufficient to maintain the parking lot in good repair. Instead, their witness testified that Bill's Food and Gammon & Sons should have properly sealed or coated the parking lot as a part of regular maintenance. Testimony by Bill's Food's witness was, however, that sealing has no effect after the first ten years of the life of a parking lot and there was no evidence that the lot had been sealed prior to the lease with Bill's Food when the parking lot was nineteen years old. The witnesses for the Lessors and Bill's Food presented conflicting testimony concerning whether the resealing that occurred when the lease was terminated was necessary or merely cosmetic. The trial court determined the credibility of the witnesses and resolved these conflicts in the evidence in favor of Bill's Food. *Ken Cucchi Constr.*, 973 S.W.2d at 524. The trial court was free to believe

the testimony that there was no lack of maintenance by either Bill's Food or Gammon & Sons which created the need for structural repairs and that the $7,084 expended by Lessors to reseal the parking lot was unnecessary and for cosmetic purposes only.

■ Therefore, having found that the need for structural repairs was not attributable to a lack of maintenance on the part of Bill's Food and Gammon & Sons, the inquiry now turns to whether Bill's Food and Gammon & Sons are otherwise responsible for the costs of the structural repairs under the terms of the lease. In interpreting leases, this court will "give effect to the true intention of the parties by considering the language used in the lease." *Washington Univ. v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 464 (Mo.App.1990). Where a lease is unambiguous, this court will look only to the actual text of the agreement for evidence of the parties' intentions. *Id.* When considering repair covenants, the meaning of these provisions "derives from all the relevant circumstances reflected in the language of the lease." *Id.* at 465. Where there is a repair clause and a surrender clause in the lease, "the repair clause cannot be considered alone[,]" but "[b]oth clauses are to be read together and construed together." I M. Friedman, Friedman on Leases, § 10.601, p. 720 (4th ed.1997).

■ The lease in this case contained no provision expressly allocating the costs of "structural repairs" to the lessee. In considering the intent of the parties and the requirements of the lease, three sections of the lease are relevant: (1) Section 3(c)— the repair and maintenance clause; (2)

$17,500. Lessors' expert testified at trial concerning a $17,812.50 estimate, although he

stated that he had not prepared a proposal to permanently fix the parking lot.

Section 3(e)—the "net-net-net lease" provision; and (3) Section 3(i)—the surrender clause. First, the repair and maintenance clause, § 3(c), stated that the lessee covenanted and agreed "[t]o maintain in good condition all portions of the building, parking lot and premises and do all decorating and maintenance at Lessee's own expense." Section 3(e) of the lease contained the intent of the parties to enter into a "net-net-net" lease and discussed the responsibilities of the lessee with respect to repairs and maintenance:

> It is the intent of the Lessors that the monthly base rent set forth in Paragraph 1 above shall be a "net-net-net rental", as those terms are used and understood in connection with leasing of real property and improvements. Accordingly, as additional rental hereunder, Lessee shall pay all expenses accruing from and after July 1, 1995, directly to the appropriate entity or person, as the case may be; all taxes and assessments levied against the premises or any portion thereof whether federal, state or local or of any kind or nature, public utility and related costs and expenses, insurance premiums, *expenses of operating, maintaining and repairing the premises,* and any other expenses or charges which during the Lease Term shall be levied, assessed or imposed upon or with respect to or incurred in connection with, the possession, occupation, operation, alteration, maintenance, repair and use of the premises, it being intended that this lease shall result in a rental to be paid to Lessors without additional cost to Lessors or diminution or offset thereto in the fixed monthly amount specified hereinabove.

(Emphasis added). Finally, § 3(i) required that the lessee "surrender said premises at the end of the term of this lease in as good condition as received, ordinary wear and tear excepted[.]"

In determining whether Bill's Food is responsible for the cost of structural repairs, this court must determine whether these lease provisions contemplated and the parties intended that the lessee would be responsible for repairs of a structural nature. The repair clause, § 3(c), required that the lessee maintain the parking lot in good condition. In contrast, the surrender clause required only that the lessee surrender the premises "in as good condition as received, ordinary wear and tear excepted." When the repair and surrender provisions are read together, Lessors' contention that Bill's Food is responsible for structural repair costs is not supported by general principles concerning the scope of a tenant's covenant to repair without expressly including a provision for replacements. *See* FRIEDMAN, § 10.601, p. 724; *Jacobi v. Timmers Chevrolet, Inc.,* 164 Ga.App. 198, 296 S.E.2d 777, 779 (1982). "A tenant's covenant to maintain or repair generally does not require him to replace something worn out." FRIEDMAN, § 10.601, p. 723.

The other relevant lease provision is § 3(e), which provides for a "net-net-net lease." Generally, a "net" lease would contemplate structural repairs:

> A net lease presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance or any other charges, other than landlord's income taxes. Accordingly, the repair clause requires tenant to make all repairs, inside and out, structural and otherwise, as well as all necessary replacements of the improvements on the premises (and to comply with all legal requirements affecting these improvements during the term). A lease is not 'net', as this term is used in long-term leases, if the ten-

ant's repair obligations are less than these.

*Id.* at § 10.8, p. 741.

■ In the context of short-term leases, however, policy supports requiring specific language in the lease obligating a lessee to make structural repairs. Generally, Missouri courts have been "reluctant to construe 'repair' to include major structural repairs" where the lease is for a short term. *Washington Univ.*, 801 S.W.2d at 465. This court has held that a provision describing the lease · as a "net lease" does not necessarily require the lessee to make structural repairs where no explicit obligation to do so exists. *Mobil Oil Credit Corp. v. DST Realty, Inc.*, 689 S.W.2d 658, 660–61 (Mo.App.1985). Merely naming a lease a "net lease" to require such an obligation is creating "a legal effect in the lease because of what it is called rather than what it does." *Id.* Rather, "a tenant cannot be held for substantial structural repairs unless it so specifically agrees in the lease." *Id.* at 661. This is so because the burden of making substantial structural repairs naturally falls on the lessor, so shifting the burden to the lessee should require specific language in the lease. *Id.*

In *Mobil*, this court considered the fact that the lease was for only ten years in deciding that structural repairs were not the lessee's obligation. *Id.* Here, Bill's Food entered into the original lease in August 1991. Less than four years later, in June 1995, the lease was assigned to Gammon & Sons. The original term under the assignment ran through June 1999, however, the lease was terminated in 1998. Even if the lease had continued through 1999, the aggregate of the terms of the original lease and assignment would have been only eight years.

When the lease is short-term, the costs of the structural repairs as compared to the amount of the rent and which party would receive the benefit of the structural repairs would justify keeping the burden of making substantial structural repairs on the lessor unless explicitly agreed upon otherwise. *See id.* In *Mobil*, this court held that it was unfair for a tenant, who had five years remaining under a lease, to pay $438,000, or even one half that amount, where the annual rent was $350,000 for the first five years and $400,000 for the remaining five years. *Id.* In so holding, this court quoted a Wyoming Supreme Court case, *Scott v. Prazma*, 555 P.2d 571, 578 (Wyo.1976), which stated that to require the lessee to make substantial repairs, additions and replacements to bring the building up to current building codes "[wa]s obviously unfair because it would give [lessor] a better, fully reconstructed building than he leased, the life of which improvements would extend far beyond the [lessee's] remaining term of less than eight years." *Cf. Washington Univ.*, 801 S.W.2d at 465–66 (distinguishing itself from *Mobil* and other short-term lease situations on the basis that its facts involved a twenty-five year, long-term lease where the lessee had more time to amortize the cost of making substantial structural repairs over the life of the lease).

As for the cost of the structural repair in this case, Lessors' expert testified that, in 1998, the cost to bring the parking lot into good condition ranged from $15,000 to $20,000, and Bill's Food's expert estimated the cost at almost $30,000. The annual rent for the premises is $66,000. Thus, the cost of repair could range from 27% to 45% of the annual rent. When comparing the cost of the structural repair to the amount of annual rent, the cost of the structural repair is a significant amount considering the lease has been terminated and neither Gammon & Sons nor Bill's

Food will receive the benefit of the repairs. *See Mobil,* 689 S.W.2d at 661. Here, only Lessors and subsequent tenants would receive any benefit from the overlay to the parking lot.

Here, too, requiring Bill's Food to pay for the total costs of repair would give Lessors the benefit of, in essence, a new parking lot, where Bill's Food originally received a parking lot approaching the end of its natural life. The evidence at trial was that the parking lot was not in good condition at the time of the original lease in 1991. In fact, Bill's Food's evidence was that the average life of a parking lot is 15 years, and that the parking lot was 19 years old, cracked, and with pot holes when the original lease was signed. The evidence at trial was that the parking lot was approaching the end of its natural life. Lessors' expert witness even agreed. Absent a specific lease provision that would have required the tenant to replace structures or items that had deteriorated due to time, the lessee should not be responsible for the costs of repairs that would cause the condition of the parking lot to be better than received. *See Jacobi,* 296 S.E.2d at 779.

Without an express provision in the lease requiring the lessees to make structural repairs, and in light of the short-term nature of the lease in this case, the high cost of the structural repair compared to the annual rent, the absence of any benefit of the repair to the lessees, and the deteriorated condition in which the lessees received the parking lot at the beginning of the original lease, this court finds that Bill's Food is not responsible for the costs of structural repair associated with the overlay of the parking lot. Lessors' second point is denied.

### Prejudgment Interest

Next, Lessors contend the trial court erred in failing to award prejudgment in-

terest under § 408.020, RSMo 1994. They assert that the claims were liquidated according to the terms of the lease agreement. Lessors argue that they should have been awarded prejudgment interest on the rent and on the repairs to the parking lot already undertaken by Lessors.

"'Interest' is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because the obligor questions legal liability for all or portions of the claim." *J.R. Waymire Co. v. Antares Corp.,* 975 S.W.2d 243, 248 (Mo.App.1998). While parties may agree on a specific rate of interest, their failure to do so implicates § 408.020, RSMo 1994. *Id.* Section 408.020 reads as follows:

> Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.

Prejudgment interest may only be awarded where the claim is liquidated. *J.R. Waymire,* 975 S.W.2d at 248. To be liquidated, the claim must be "fixed and determined or readily ascertainable by computation or a recognized standard." *Id.* A claim is not converted into an unliquidated one simply by "the interposition of an unliquidated counterclaim, set-off or recoupment." *Herbert & Brooner Constr. Co. v. Golden,* 499 S.W.2d 541, 553 (Mo.App. 1973). "In an action for breach of [a writ-

ten] contract 'interest ordinarily runs from the date of the breach or the time when payment was due under the contract.'" *Wulfing v. Kansas City S. Indus., Inc.,* 842 S.W.2d 133, 161, n. 16 (Mo.App.1992) (quoting *Prudential Ins. Co. of Am. v. Goldsmith,* 239 Mo.App. 188, 192 S.W.2d 1, 3 (1945)).

■ Here, the rental payments due under the lease were fixed and ascertainable. The presence of Lessors' claim for structural repairs to the parking lot does not make the amount unascertainable. Likewise, the argument of Bill's Food that the claim is unascertainable because it was entitled to a credit for rent paid by the subsequent tenant is without merit. Bill's Food did not dispute that it was liable for the partial month's rent, which was easily calculated by prorating.

■ There is evidence in the record that Mr. Gammon offered to pay a portion of the rent due for March 1998. This tender, however, was contingent upon Lessors providing a full release of their other claims. "Conditioning a proposed tender upon release of all claims or any other reciprocal action on the tenderee's part invalidates the tender and continues the accrual of prejudgment interest." *Ins. Co. of N. Am. v. Skyway Aviation, Inc.,* 828 S.W.2d 888, 892 (Mo.App.1992).

Thus, Lessors are entitled to prejudgment interest for the portion of the rent due for March 1998. The decision of the trial court denying prejudgment interest is reversed and this case is remanded with directions that the judgment be modified to include prejudgment interest for on the portion of the rent due for March 1998.

**2.** The fact that rent was due under the lease for March 1998 was not in dispute at trial; the issue was how much. The only contested issue on the rent claim concerned the actual

**Attorney's Fees**

In their final point on appeal, Lessors claim that the trial court erred in failing to award attorney's fees and costs because the contract terms provide for such an award. Section 3(j) of the lease stated that "[i]n the event the Lessors deems it appropriate to collect any rental or other expense payable by the Lessee after the expiration of any grace period and notice, by use of an attorney, then the Lessee shall be responsible for all attorney's fees and costs of collection incurred by the Lessors."

■ Where a contract provides for payment of attorney's fees and costs expended to enforce the contract, a trial court is required to award such fees and costs to the prevailing party. *Schnucks Carrollton Corp. v. Bridgeton Health & Fitness, Inc.,* 884 S.W.2d 733, 739 (Mo. App.1994). The Eastern District of this court considered the concept of "prevailing party" in the context of a suit seeking the balance due on a construction contract. *Ken Cucchi Constr.,* 973 S.W.2d at 528. The court held that "[a] prevailing party is the party prevailing on the main issue in dispute, even though not necessarily to the extent of its original contention." *Id.*

In this case, there were two issues at trial and on appeal: (1) the amount of rent due under the lease,[2] and (2) whether Bill's Food was responsible under the lease for the costs for the overlay and resealing of the parking lot. The trial court determined that rent was due for twenty-two days for the month of March 1998. While Lessors were not awarded the full month's rent that they claimed was due under the lease, they nonetheless prevailed with respect to enforcing the rent provision of the lease for a portion of the rent due for that

date of the termination, determined by the court to be March 22. In fact, as discussed above, Lessors' testimony on cross-examination established this date at trial.

month. Thus, on the issue of rent due, Lessors were the prevailing party.

With respect to the repairs to the parking lot, this court has determined that because of the nature of this lease, this court would not construe the lease to include structural repairs absent an express provision. Thus, this court has determined that the lease did not provide for these types of repairs. Any attempt to recover attorney's fees associated with recovery of these costs, therefore, would not be based upon lease or contractual provisions. *See Tower Props. Co. v. Allen,* 33 S.W.3d 684, 690 (Mo.App.2000).

The facts of this case present a situation where the request for attorney's fees was based on contractual provisions in one respect, but not the other. Had this court determined that the costs of the repairs to the parking lot were, in fact, contemplated by the lease, then the cost for those repairs would have been considered "additional rent" under the provisions of Section 3(e) of the lease. An award for repair costs as "additional rent" would, thus, have been based upon contractual provision. As a result, Lessor's argument for attorney's fees for enforcing the "additional rent" provisions could have been considered under the attorney's fees provision of Section 3(j). Since the lease did not contemplate structural repairs, however, the request for attorney's fees was not based upon a contractual provision providing for such. In addition, Bill's Food is not responsible for the repairs, so Lessors are not the prevailing party with respect to this issue.

Here, Lessors were successful in their attempt to enforce the rent provisions of the lease, even though not to the extent that they had originally sought. *Ken Cucchi Constr.,* 973 S.W.2d at 528. Thus, Lessors are entitled to "reasonable attorney's fees for that part of the action which seeks to enforce [Bill's Food's] obligations

under the lease[.]" *Schnucks,* 884 S.W.2d at 740. They are not, however, entitled to recover attorney's fees with respect to their seeking costs associated with the repairs to the parking lot, since they were not the prevailing party on this issue, *Ken Cucchi Constr.,* 973 S.W.2d at 528, and none of the exceptions to the "American Rule," requiring litigants to bear their own expenses for attorney's fees, applies to this case. *Tower Props.,* 33 S.W.3d at 690.

Thus, Lessors are entitled to attorney's fees for that portion of the action associated with their recovery of $3,903.23 rent for March 1998. The decision of the trial court denying attorney's fees is reversed and this case is remanded so that the trial court can make such an order for attorney's fees "as it deems reasonable and proper." *Jackes–Evans Mfg. Co. v. Christen,* 848 S.W.2d 553, 557 (Mo.App.1993). Lessors have also filed a motion for their attorney's fees on appeal. This court remands the issue of whether Lessors are entitled to attorney's fees on appeal, "which shall be taken up and addressed by the trial court at the time that it considers attorney's fees incurred ..." with respect to Lessors' enforcement of the rent provisions of the lease. *WEA Crestwood Plaza, L.L.C.,* 24 S.W.3d at 10 n. 5.

This court affirms the trial court's judgment awarding a partial month's rent and denying Lessors' claims for the costs of repairing the parking lot. The portions of the judgment denying Lessors' claim for prejudgment interest on the $3,903.23 judgment for rent and for attorney's fees are reversed and the case is remanded for further proceedings on those claims consistent with this opinion.

All concur.