**IN THE COURT OF APPEALS OF IOWA**

No. 3-1201 / 12-2145
Filed April 16, 2014

**THE PRINTER, INC.,**
    Plaintiff-Appellant,

**vs.**

**BENSKIN BROS., INC.,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Polk County, D.J. Stovall, Judge.


Tenant appeals the district court's declaratory judgment ordering it to replace the HVAC system and parking lot of the leased building. The tenant also appeals the district court's award of attorney fees to the landlord. **REVERSED AND REMANDED WITH DIRECTIONS.**


Steven Wandro of Wandro & Associates, P.C., Des Moines, Mark E. Weinhardt and Danielle M. Shelton of Weinhardt & Logan, P.C., Des Moines, for appellant.

Timothy C. Hogan of Hogan Law Office, Des Moines, for appellee.


Considered by Danilson, C.J., and Vaitheswaran and Mullins, JJ.

**DANILSON, C.J.**

The Printer, Inc. (TPI) appeals the district court's ruling ordering it to pay for the replacement of the leased facility's heating, ventilation, and air conditioning (HVAC) system, as well as the replacement of the parking lot.[1] TPI maintains the lease agreement requires the landlord, Benskin Bros, Inc., (Benskin) to replace the HVAC system and parking lot. TPI also maintains the district court erred by ordering it to pay the "reasonable attorney fees" of Benskin. Because we find the language of the lease does not require TPI to replace the HVAC system and parking lot, we reverse the district court's ruling ordering TPI to do so. Furthermore, because we conclude it is reasonable to imply a duty to make major repairs or replace the HVAC system and the parking lot upon Benskin, and that these obligations are indispensable to the purpose of the lease between these parties, we remand with directions to enter an order obligating Benskin to make such repairs or replacements as become necessary. We also remand with directions for the district court to determine whether TPI may recover breach of contract damages for reimbursement for repairs to the HVAC system. Finally, we reverse the district court's award of attorney fees and expert fees to Benksin.

**I. Background Facts and Proceedings.**

This case arises out of a fifteen-year commercial-lease agreement between Benskin and TPI for an industrial facility used by TPI for operation of its

---

[1] Although we refer to the issue as "replacement of the parking lot," as the parties and district court did, it is clear from the record that the claim actually revolves around the issue of replacing or redesigning eaves on the building that empty into the parking lot, creating a flow of water that then creates an icy condition in the parking lot during the winter months.

technology and printing business. At issue in the lawsuit is which party, if either, is required by the lease to replace the aging HVAC system and the parking lot of the facility.

On June 14, 2011, TPI filed the underlying action against Benskin for breach of contract and a declaratory judgment. TPI alleged the terms of the lease required Benksin to replace twenty-five out of the twenty-seven[2] heating and cooling units and had failed to do so. In its answer, Benskin denied all claims and filed a counterclaim for breach of contract and declaratory judgment, asserting that TPI was responsible for all repair and replacement of the HVAC system and parking lot.[3]

---

[2] At trial, TPI explained that the building was leased for the particular purpose to run its printing business. The printing business requires several large machines, which emit a certain amount of heat, to run throughout the business day. Furthermore, for the ink to set correctly on the pages, the temperature within the building has to be consistently maintained. It is for this reason the building requires twenty-seven HVAC units. At the time TPI leased the building, only twenty-five units were in place, but the tenant had two extra units installed "for a specific requirement of [the] business."

[3] The lease in questions reads, in pertinent part:

> This lease is made and entered into on May 14, 2004, by and between Benskin Bros., Inc. ("Lessor"), and The Printer, Inc. ("Lessee")("Lease"). Mr. William C. Benskin has personally guaranteed the obligations of Lessee under this Lease pursuant to a separately delivered personal guarantee.
> 1. Premises and Term. In consideration of rents, covenants, and agreements of Lessee set forth herein, Lessor does hereby lease the real property, buildings, and improvements, hereinafter the "premises", located in the City of Des Moines, County of Polk, State of Iowa. . . .
> . . . .
> 6. Repairs and Use. Except as herein provided, Lessor and Lessee agree:
> a. Lessee shall keep the premises in good repair and deliver to Lessor physical possession of the premises, upon the termination of this Lease or any extension thereof, in good condition, ordinary wear and tear excepted. Lessee, at the termination of the lease, may remove all trade fixtures, additions, installations or alternations installed by Lessee after the beginning of this Lease, provided Lessee repairs any damage caused by removal thereof. If Lessee does not remove such fixtures, additions, installations or alterations within, five days after the end of the term, the

same shall be conclusively deemed to have been abandoned to Lessor, and Lessee shall have no further rights or obligations relating thereto.

. . . .

7. Alterations. Lessee shall have the right to make alterations to the premises with the written consent of the Lessor, which consent shall not be unreasonably withheld. Alterations made by the Lessee will be made in a first-class workmanlike manner. All fixtures, equipment and furnishings installed in or attached to the premises by and at the expense of Lessee may be removed by Lessee at any time or from time to time when not in default hereunder, provided that their removal will not damage the premises or that any damage caused by their removal will be promptly repaired by Lessee at its expense and provided further mat any such property not so removed before the expiration of this Lease, or as provided above, shall become the property of the Lessor.

8. Repairs by Lessor. Lessee shall not be obligated to maintain the roof, foundation, structure, or existing metal siding of the buildings situated on the premises. Lessor shall be obligated to maintain the roof on said premises in a weather-proof condition and agrees to reimburse Lessee (net of any insurance received by Lessee) for any damage to Lessee or Lessee's property caused by failure of Lessor to keep said roof in a weather-proof condition and agrees to reimburse Lessee for any damage to Lessee or Lessee's property caused by failure to Lessor to keep roof in a weather-proof condition. Notwithstanding any other provision of this Lease, Lessee shall be responsible for the periodic maintenance of the areas on the roof where the heating and air-conditioning were inserted through roof.

9. Damage by Casualty or Fire. If said premises should be damaged or destroyed by casualty, explosion or fire, however caused, or by the elements or any cause or happening, so as to be unfit, in the opinion of Lessee for Lessee's continued use, then this Lease shall immediately cease and terminate and any rent paid in advance shall be apportioned and refunded to Lessee; but if said premises should be damaged and destroyed by casualty, explosion or fire, however caused, or by the elements or any cause or happening and still be fit, in the opinion of Lessee, for Lessee's continued use, then the same shall promptly be restored by Lessor to its previous condition and a just and fair proportion of the rent herein reserved shall abate until the same have been completely restored and a like proportion of any rent paid in advance shall be refunded to Lessee.

. . . .

11. Quiet Enjoyment. Lessor agrees to put Lessee in possession of said premises at the commencement of the term and agrees that Lessee, upon paying the rent and performing the covenants and conditions hereof, shall peaceably and quietly have, hold and enjoy said premises and all appurtenances thereof during the full term without any interruption of Lessor or anyone claiming by, through or under Lessor.

. . . .

13. Health and Safety. Lessee agrees that at the time during the term of this Lease comply with all ordinances, orders, laws and requirements of all governmental authorities having jurisdiction over said premises

A bench trial was held on September 5, 2012.  Following the trial, the district court entered a findings of fact, conclusions of law, and order.  In it, the district court found the language of the lease was unambiguous and required TPI to maintain, repair, and when needed, replace the HVAC system and parking lot as required to bring the premises into "good condition."  Accordingly, the district court ordered the TPI to do so.  It also ordered TPI to pay all costs incurred by Benskin, "including reasonable attorney's fees and expert witness fees, to be determined by the Court."  TPI appeals.

**II. Standard of Review.**

Appellate review of an action for declaratory relief is determined by the manner in which the action was tried to the district court.  *United Fire & Cas. Co. v. Iowa Dist. Ct.*, 612 N.W.2d 101, 103 (Iowa 2000).  This case concerns an alleged ambiguity in the provisions of a lease, a matter generally resolved as a matter of law.  *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999).  The parties do not disagree with this standard of review.

While we are not bound by the district court's legal conclusions, we are bound by its findings of fact if such findings are supported by substantial evidence in the record.  *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991).  An appellate court is not free to substitute its own findings of fact for those of the district court simply because the evidence

respecting licenses, sanitary and health requirements, police regulation, fire prevention and nuisances; provided, however, that nothing in this paragraph shall require Lessee to make or pay for any improvements, repairs, alterations, additions or structural changes to said premises.
. . . .
23. Entire Agreement.  This Lease contains the entire agreement of the parties. It may be modified only by an agreement in writing signed by the parties.

supports different inferences. *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000).

Whether to grant common law attorney fees rests in the court's equitable powers. *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 159 (Iowa 1993). Thus, our review of the issue is de novo. *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003).

### III. Discussion.

#### A. Interpretation of Lease.

The district court found that the lease unambiguously required TPI "to perform such maintenance, repair and replacement of the Premises, including (but not limited to) the HVAC and the Parking lot, as may be required to bring the Premises into good condition" and entered a declaratory judgment accordingly. Here, TPI argues the district court erred in its determination, because the lease, unambiguously or not, requires Benksin to make such necessary replacements. TPI also argues, in the alternative, that if we find the lease does not require Benskin to make the replacements, we should vacate the judgment of the district court and enter an order stating the lease does not impose a duty to replace upon either party.

Leases are contracts as well as conveyances of property, and ordinary contract principles apply. *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997). Where, as here, the dispute centers on the meaning of certain lease terms, we engage in the process of interpretation, rather than construction. *See Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (stating

interpretation is process of determining meaning of contract terms while construction is process of determining legal effect of such terms).

The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co.*, 602 N.W.2d at 797. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." Restatement (Second) of Contracts § 202 cmt. a (1981). In doing so, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. *Hartig Drug Co.*, 602 N.W.2d at 797. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.*

**1. TPI's Obligation to Make Repairs.**

We do not believe the lease agreement requires TPI to replace the HVAC system or the parking lot. The lease imposes a duty upon TPI to "keep the premises in good repair and deliver to Lessor physical possession of the premises, upon the termination of this Lease or any extension thereof, in good condition, ordinary wear and tear excepted." The district court determined TPI's obligation to keep the premises in "good repair" and to deliver the property back to Benksin in "good condition, ordinary wear and tear excepted" requires TPI to maintain, repair, and *replace* as necessary. However in *Mastland v. Evans Furniture, Inc.*, 498 N.W.2d 682, 686 (Iowa 1993), our supreme court considered whether tenants had breached their lease requiring them to return the property in the same condition as at the commencement of lease, ordinary wear and tear

excepted, after the building was damaged in a fire and the tenants did not repair the damage.  The court determined the tenant was not in breach, stating:

> [T]he common law rule provides that . . . [t]he tenant is only required, in the absence of stipulations in the lease, to use reasonable diligence to protect buildings on the demised premises from fire, and is not liable for accident damages or destruction by fire; he is liable only if the buildings are destroyed through his wrongful act or negligence.

*Id.* at 687 (citing 49 Am. Jur .2d *Landlord and Tenant* § 934, at 910 (1970)).  Our supreme court, discussing a life tenant rather than a tenant with a commercial lease for a specific term, stated that a "tenant must, at his own expense, make such repairs as are necessary to preserve the improvements and to prevent waste due to dilapidation.  Of course, he is not bound to make extraordinary repairs, which involve the substitution of new structures for old, or parts thereof for old." *In re Estate of Gauch*, 308 N.W.2d 88, 91 (Iowa 1981).  We believe the same rule applies.

Here, the terms of the lease do not specifically impose an obligation to replace, only repair and maintain.  Similar to the tenant in *Mastland*, and the life tenant in *In re Estate of Gauch*, unless there was some fault, wrongful act, or negligence on behalf of TPI, TPI is not obligated to replace a depreciable asset which has reached the end of its useful life.  Here, TPI had a duty to maintain the HVAC system and parking lot.  Having done that, it does not have a duty to replace either the parking lot or the HVAC system due to ordinary wear and tear.

To impose a duty to replace a landlord's depreciable assets without a specific lease term is a financial burden not assumed by the tenant. This interpretation is also in harmony with the tenant's ability to install trade fixtures

and remove the fixtures at the time the lease expires.[4]  If a tenant was not entitled to remove trade fixtures, the landlord would reap a financial gain from the tenant.

### 2. Benskin's Obligation to Make Repairs.

The district court was guided by the principle that "the lessor is under no obligation to make repairs unless such obligation is imposed by the terms of the lease."  *Healy v. Tyler*, 129 N.W. 802, 803 (Iowa 1911).  However, in *Trapalis v. Gershun*, 145 N.W.2d 591, 595 (Iowa 1966), our supreme court suggests *Healy* is limited to catastrophic damage, stating:

> In that case there was flood damage.  Other cases cited by defendants involved destruction by fire or catastrophe over which neither lessor nor lessee had any control and the question was the contractual obligation of the parties.  The cases are not factually comparable to the case at bar.  Here there was no sudden catastrophe.

In *Trapalis*, the building had become so deteriorated that the plaintiff was put out of business.  145 N.W.2d at 593.  We acknowledge, however, in *Trapalis* the landlord had an express duty to maintain the structural walls unlike the contract between TPI and Benskin.

One authority has explained the evolution of the law requiring a landlord to make repairs, stating:

> At old common law the landlord was under no duty to repair unless he expressly promised to make such repairs. If the landlord obligated himself to make repairs but failed to do so, the tenant was left to his action for damages only and was not allowed to terminate the lease or be relieved of his obligation to pay rent due to the

---

[4] Section six of the lease agreement, which states, "Lessee, at the termination of the lease, may remove all trade fixtures, additions, installations or alternations installed by Lessee after the beginning of this Lease, provided Lessee repairs any damage caused by removal thereof."

principle that the two obligations were not mutually dependent. Only when the landlord's breach amounted to constructive eviction could the tenant vacate the premises and be relieved of his obligation to pay rent. Modern decisions generally have relaxed the requirements for constructive eviction to the point of ignoring the concept of independence of promises. A lease should be governed by the contract principle that the parties' obligations are mutually dependent. This is analogous to the emerging position taken by a number of courts that the landlord's warranty of habitability and the tenant's obligation to pay rent are mutually dependent.

Restatement (Second) of Property, Land & Ten. § 5.5 (Reporter's note to section 5.5 #5) (1977) (internal citations omitted). Although the property involved in this action is a commercial property and not residential, the obligation of Benskin to make a repair depends entirely upon the facts.

Here there is no provision in the contract requiring Benskin to maintain the structure, including the parking lot, and HVAC system in good repair, a suitable condition, or to TPI's high standards. Notwithstanding Benskin's right to let the property fall into disrepair, Benskin did promise quiet enjoyment of the property in section eleven of the lease agreement. Much like the facts in *Trapalis*, if the property became in such disrepair that TPI was put out of business, TPI may be entitled to claim constructive eviction. Thus, a lessor's right to allow its commercial property to become in disrepair may have its limits.

Moreover, we note section thirteen of the lease absolves TPI from making any "repairs, alterations, additions or structural changes to the premises" to comply with laws and ordinances related to safety and health requirements. By implication, we can only conclude any such repair must fall upon the responsibility of Benskin.

Notwithstanding we are unable to conclude from our facts however, that the repairs to the HVAC system or the parking lot are so significant that TPI will be put out of business or any law or ordinance is violated.

In respect to any other implied promise to repair the HVAC system and parking lot, one authority has stated:

> Where it would not be reasonable in the light of the term of the lease, the rent that is being paid, the purposes for which the leased property is used, and other circumstances, to expect the tenant to assume the cost of major repairs to the leased property that become necessary through no fault of the tenant, a conclusion is justified that the landlord impliedly promised to make those major repairs.

Restatement (Second) of Property, Land & Ten. § 5.5, cmt. f (1977).

This commercial property clearly was used for the primary purpose of the business being operated by TPI. The business required specific temperatures to be maintained and an HVAC system to support the business requirements. TPI was paying substantial rent, $360,000 per year. The lease was for a term of fifteen years. Replacement of the HVAC system was estimated to be $358,900. We have no estimate in respect to the parking lot but we suspect it too may involve a substantial cost.

One court has observed:

> A covenant in a lease can arise only by necessary implication from specific language of the lease or because it is indispensable to carry into effect the purpose of the lease. In determining, under contract law, what covenants are implied, the object which the parties had in view and intended to be accomplished, is of primary importance. The subject matter and circumstances of the letting give at least as clear a clue to the natural intentions of the parties as do the written words. It is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties. Terms are to be implied not because they are just or reasonable, but

> rather for the reason that the parties must have intended them and have only failed to express them or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.

*Marini v. Ireland*, 265 A.2d 526, 533 (N.J. 1970) (internal citations omitted).

In regard to the parking lot, Benskin has provided no authority to support the conclusion that a tenant is obligated to replace a deteriorated parking lot absent a specific lease provision unless the parking lot's deterioration was due to the tenant's fault, negligence, or failure to maintain it. One court has stated, "Absent a specific lease provision that would have required the tenant to replace structures or items that had deteriorated due to time, the lessee should not be responsible for the costs of repairs that would cause the condition of the parking lot to be better than received." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 624 (Mo. App. W.D. 2001). We agree.

Here, we conclude it is reasonable to imply a duty upon Benskin to repair or replace the HVAC system and the parking lot as may be necessary or become necessary. We conclude these obligations are indispensable to the purpose of the lease between these parties. This is a fair implication in light of section eight of the lease that specifically absolves TPI from making any repairs to the "roof, foundation, and structure." Such repairs do not include minor repairs to the HVAC system required for maintenance purposes, an obligation to be borne by TPI. We agree with TPI's interpretation of the contract that the parking lot is part of the "structure" as that term is used in section eight of the lease.

**B. Damages.**

In addition to its declaratory action, TPI sought breach of contract damages in the sum of $2713.57 for reimbursement for repairs to the HVAC system. Although the district court did not directly address this issue, its contract interpretation in favor of Benskin clearly prevented TPI from any recovery. Accordingly we remand to the district court to determine if TPI is entitled to recover this sum in light of our interpretation of the contract.

**C. Premises Suitable for Intended Use.**

We acknowledge TPI's petition alleged the parties' agreement required Benskin to ensure the premises were fit and suitable for the purpose for which it was leased. However, the district court did not specifically address this contention, although it did conclude that the written contract was a fully integrated agreement. TPI has not raised this issue on appeal, and accordingly we conclude the issue was waived.[5]

**D. Attorney Fees.**

The district court awarded Benskin "all reasonable attorney's fees and expert witness fees." Both parties concede that neither the leasing agreement in question nor an applicable statute provide for such an award. As such, TPI asks that we reverse the district court's award.

"Generally, a party has no claim for attorney fees as damages in the absence of a statutory or written contractual provision allowing such an award." *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003). However, the district

---

[5] *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [TPI] might have made and then search for legal authority and comb the record for facts to support such arguments."); *see also* Iowa R. App. P. 6.903(2)(g)(3).

court may award common law attorney fees if a party proves the opposing party's conduct exceeds the "willful and wanton disregard for the rights of another standard required to prove punitive damages." *Id.* "The opposing party's conduct 'must rise to the level of oppression or connivance to harass or injure another.'" *Id.* (quoting *Hockenberg Equip. Co.*, 510 N.W.2d at 159. Here, we have concluded Benskin is not the prevailing party, and thus this is not one of the rare instances where common law attorney fees may be awarded. *See Id.*

Thus, we reverse the district court's award of attorney fees and expert witness fees.

## IV. Conclusion.

Because we find the language of the lease does not require TPI to replace the HVAC system and parking lot, we reverse the district court's ruling ordering TPI to do so. Furthermore, because we conclude it is reasonable to imply a duty to make major repairs or replace the HVAC system and the parking lot, as may be necessary, upon Benskin, and these obligations are indispensable to the purpose of the lease between these parties, we remand with directions to enter an order obligating Benskin to make such repairs or replacements as become necessary. We also remand with directions for the district court to determine whether TPI may recover breach of contract damages for reimbursement for repairs to the HVAC system. Finally, we reverse the district court's award of attorney fees and expert fees to Benksin.

**REVERSED AND REMANDED WITH DIRECTIONS.**