

# In the Missouri Court of Appeals Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| CP3 BP ASSOCIATES LLC, | ) | No. ED109656 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable John F. Newsham |
| CSL PLASMA INC., | ) | |
| | ) | |
| Appellant. | ) | FILED: April 5, 2022 |

## Introduction

CSL Plasma Inc. ("CSL Plasma") appeals from the trial court's judgment granting unlawful detainer to CP3 BP Associates LLC ("CP3"). Following a bench trial, the trial court found that CSL Plasma breached the commercial lease agreement (the "Lease") governing its long-term tenancy in CP3's shopping center operating a blood plasma donation center, thereby allowing CP3 to terminate the Lease and demand possession of the leased premises. CSL Plasma raises three points on appeal challenging the trial court's judgment. Point One asserts that CSL Plasma's alleged failure to control the conduct of third-party invitees in the common area of the shopping center did not constitute a material breach of the Lease, and therefore the trial court erroneously declared and applied the law in entering a judgment of unlawful detainer. Point Two argues the trial court's judgment was against the weight of the evidence because CP3 did not adduce evidence showing CSL Plasma engaged in conduct that materially breached the Lease. Point Three contends the trial court erred in awarding CP3 attorneys' fees as a matter of

law because neither the unlawful-detainer statute nor the Lease provided for the recovery of attorneys' fees in the case.

The Lease assigns exclusive control over the common area of the shopping center to CP3. The Lease provisions CSL Plasma is alleged to have breached restrict CSL Plasma's use of the separately-defined space of the leased premises. Because all of the evidence of breach adduced at trial related to conduct of third-party invitees that occurred in the common area of the shopping center, the trial court erred as a matter of law in interpreting the Lease to find that CSL Plasma materially breached and forfeited the Lease. We therefore grant Point One. Our holding in Point One renders discussion of the remaining points on appeal moot. Accordingly, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

## Factual and Procedural History

CSL Plasma and Concord Plaza Associates, LLC entered into the long-term commercial Lease in May 2014 for CSL Plasma to operate a blood plasma collection center within the Concord Plaza Shopping Center (the "Shopping Center"). CP3 is the successor-in-interest to Concord Plaza Associates, LLC and assumed the Lease as landlord. CSL Plasma operates over 230 plasma collection centers nationally. The parties substantially negotiated and modified the terms of CP3's standard lease over a period of several months before executing the subject Lease. During the lease negotiations, CP3 toured one of CSL Plasma's blood plasma collection centers in the St. Louis area.

The Lease defines the leased premises (the "Leased Premises") as the 9,000 square feet of retail space within the Shopping Center in which the tenant, CSL Plasma, operates its business. Section 10, "Common Area Defined," denotes the following:

2

10.2 **The [C]ommon [A]rea shall be subject to the exclusive control and management of Landlord,** and Landlord shall have the right to establish and modify, change and enforce uniform and non-discriminatory rules and regulations with respect to the common areas, and Tenant agrees to abide by and conform with such rules and regulations. **Landlord and Tenant acknowledge that, as of the date of this Lease, Landlord has not issued any rules or regulations for the Shopping Center.**

(Emphasis added). Section 10 also grants tenants and their invitees "the nonexclusive right in common with others entitled thereto to use and enjoy . . . the 'common areas' of the Shopping Center," though:

Landlord shall have the right to close any part of the common areas for such time or times as may, in the opinion of the Landlord, be necessary to prevent a dedication thereof or the accrual of any rights of any persons, but any such closing or restriction shall be for limited times only and in the manner that will not interfere with Tenant's use, enjoyment and occupancy of the Leased Premises during normal business hours.

Section 5 of the Lease, "Use of Leased Premises," provides in full:

**Tenant shall not use nor permit the Leased Premises to be used for any purpose other than: a blood plasma collection center and related processing and related general office purposes** and shall comply promptly with all statutes, ordinances, rules, orders, regulations and requirements of Federal, State, County and City Governments, including without limitation, those relating to the use, occupancy, cleanliness and safety of the Leased Premises and the manner of operation of the business conducted at the Leased Premises. **Tenant will not use, or permit the use of the Leased Premises, in any such manner that will tend to create a nuisance or tend unnecessarily to disturb other tenants or occupants of the Shopping Center or tend to injure the reputation of the Shopping Center. The restrictions set forth in this section shall extend to all agents and employees of the Tenant,** and shall be included as a provision in all leases or contracts made with any subtenant, concessionaire, or licensee.

(Emphasis added). Section 23 of the Lease governs "Tenant Conduct in Leased Premises" and provides in relevant part the following:

23.1 Tenant will keep the inside and outside of all glass in the doors and windows of the Leased Premises clean; will not place or maintain any merchandise or other articles in the vestibule or entry of the Leased Premises, on the footwalk adjacent thereto or elsewhere on the exterior thereof; will maintain the Leased Premises at its own expense in a clean, orderly and sanitary condition and free of insects,

3

rodents, vermin, termites, and other pests; **will not permit undue accumulations of garbage, trash, rubbish and other refuse, and will remove the same at its own expense, and will keep such refuse in proper containers until called for to be removed.**

. . . .

23.4 **Tenant shall not keep on, under or about or permit the escape, disposal or release from the Leased Premises or the Shopping Center or transport thereto or therefrom, any hazardous, toxic, or harmful substances (collectively referred to as "Hazardous Substances"), except as necessary for the use authorized in this Lease . . . [.]**

. . . .

Notwithstanding anything in the foregoing to the contrary, Tenant shall not be liable for any claims, damages and liabilities resulting from any Hazardous Substances on or about the Leased Premises or the Shopping Center not caused by Tenant, its officers, agents, employees, contractors, subcontractors or invitees.

(Emphasis added).

The Lease provides for a fifteen-year initial tenancy with two five-year renewal options. Problems arose during the initial tenancy, primarily relating to the conduct of CSL Plasma donors and their associates in the Common Area of the Shopping Center. Concerns from CP3 and other tenants in the Shopping Center led CP3 to issue written notice to CSL Plasma on May 6, 2019, stating that CSL Plasma was in breach of the Lease (the "Default Notice"). Specifically, the Default Notice detailed multiple incidents concerning the conduct of CSL Plasma invitees ("Invitees") in the Common Area of the Shopping Center. CP3 identified numerous incidents involving Invitees bleeding and leaving bloody bandages on the sidewalks of the Common Area after donation. CP3 also reported incidents of Invitees loitering, panhandling, engaging in drug activity, sleeping on the curb, disrupting or harassing other tenants' invitees in the Common Area, as well as engaging in verbal and physical altercations, including a dispute requiring police intervention. The Default Notice informed CSL Plasma that it had failed to comply with

4

Sections 5 and 23 of the Lease despite repeated warnings and that, pursuant to the Lease, CSL Plasma had thirty days to remedy the default.

CSL Plasma denied any default under the Lease. Both before and during the thirty-day cure period, CSL Plasma took steps to address the issues raised by CP3. CSL Plasma instructed its Invitees not to remove their bandages in the Common Area. Invitees were instructed not to loiter in the Common Area. CSL Plasma changed the manner in which employees bandaged Invitees after donation by using a more secure wrapping procedure and cleaned up discarded bandages and blood from the Common Area. CSL Plasma also installed video cameras to record footage in front of the Leased Premises and exercised its deferral process to refuse its services to problem donors. CP3 also sought to address the issues in the Common Area of the Shopping Center by reserving a parking area for CP3 donors as well as retaining security services and installing video cameras.

On June 10, 2019, CP3 provided written notice to CSL Plasma terminating the Lease (the "Termination Notice") due to CSL Plasma's failure to cure the alleged defaults in the Default Notice. Upon terminating the Lease, CP3 demanded possession. CSL Plasma refused to vacate the Leased Premises, and both parties then pursued legal remedies. CP3 filed an action for unlawful detainer, which is the subject of this appeal. In its petition (the "Petition") for unlawful detainer, CP3 alleged that CSL Plasma violated the Lease by using or permitting the Leased Premises to be used in a way which created a nuisance, disturbed other tenants, injured the reputation of the Shopping Center, and permitted the accumulation of refuse and the release of hazardous substances. The Petition claimed CSL Plasma's Invitees repeatedly bled in the Common Area of the Shopping Center, left blood, bloody bandages, and other refuse in the

5

Common Area, and engaged in conduct that was disruptive, threatening, and obnoxious toward other Shopping Center tenants, employees, and customers.

The case proceeded to a bench trial in November 2019, and evidence was taken through October 2020. At trial, it was established that CP3 had not issued any rules or regulations regarding the Common Area pursuant to Section 10 under the Lease. Following trial, the trial court found in favor of CP3 and granted CP3 unlawful detainer and associated damages as well as attorneys' fees. CSL Plasma now appeals. During the pendency of the appeal, CP3 moved for attorneys' fees, and we took the motion with the case.

## Points on Appeal

CSL Plasma raises three points on appeal. Point One argues the trial court erroneously declared and applied the law in entering a judgment of unlawful detainer in favor of CP3 because CSL Plasma did not materially breach the Lease in that the Lease imposed no duty on CSL Plasma to control the conduct of Invitees in the Common Area, which was under the exclusive control and management of CP3. Point Two contends the trial court's judgment of unlawful detainer in favor of CP3 was against the weight of the evidence because CSL Plasma did not materially breach the Lease in that the evidence failed to show that its use of the Leased Premises constituted a nuisance, injured the reputation of the Shopping Center, permitted an undue accumulation of trash, impaired the quiet enjoyment of other tenants, or permitted the escape and release of hazardous substances. Point Three maintains the trial court erred in awarding CP3 attorneys' fees as a matter of law because neither the unlawful-detainer statute nor the Lease provided for the recovery of attorneys' fees in the present unlawful-detainer action.

## Standard of Review

"In appeals from actions for unlawful detainer, our standard of review is the same as in other court-tried civil cases." Goser v. Boyer, 633 S.W.3d 482, 485 (Mo. App. E.D. 2021). We

6

will sustain the trial court's judgment "unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or misapplies the law." AB Realty One, LLC v. Miken Techs., Inc., 466 S.W.3d 722, 728 (Mo. App. E.D. 2015) (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)). "We review [the] evidence in the light most favorable to the prevailing party, giving that party the benefit of all reasonable inferences and disregarding contrary evidence and inferences." Goser, 633 S.W.3d at 485–86 (quoting Fed. Nat'l Mortg. Ass'n. v. Wilson, 409 S.W.3d 490, 494 (Mo. App. E.D. 2013)). "[W]e defer to the trial court's assessment of the evidence if any facts relevant to an issue are contested." AB Realty One, 466 S.W.3d at 728 (citing Moore v. Bi–State Dev. Agency, 132 S.W.3d 241, 242 (Mo. banc 2004)).

However, we review questions of law de novo. Goser, 633 S.W.3d at 486 (internal citation omitted). The interpretation of a lease agreement is a question of law. AB Realty One, 466 S.W.3d at 728 (internal citations omitted). "Thus, we review the [trial] court's interpretation of the lease de novo but defer to the [trial] court's findings of fact." R & J Rhodes, LLC v. Finney, 231 S.W.3d 183, 187 (Mo. App. W.D. 2007); AB Realty One, 466 S.W.3d at 728–29 (internal citations omitted).

## Discussion

In its action for unlawful detainer, CP3 alleged CSL Plasma materially breached the Lease, which then authorized CP3 to terminate the Lease and demand possession of the Leased Premises. "An action for unlawful detainer is a limited statutory action where the sole issue to be decided is the *immediate right* of possession to a parcel of real property." Goser, 633 S.W.3d at 486 (citing Wilson, 409 S.W.3d at 495). "Where a party fails to perform according to the terms of the contract, it must be determined whether the breach is material." Premier Golf Mo., LLC v. Staley Land Co., LLC, 282 S.W.3d 866, 873 (Mo. App. W.D. 2009) (internal quotation

7

omitted). "If one party to a contract materially breaches that contract, the aggrieved party may cancel the contract and be relieved of its obligation under the contract." G & J Holdings, LLC v. SM Props., LP, 391 S.W.3d 895, 903 (Mo. App. E.D. 2013) (internal quotation omitted); Premier Golf, 282 S.W.3d at 873; see also Miller v. Gammon & Sons, Inc., 67 S.W.3d 613, 618 (Mo. App. W.D. 2001) (noting that a commercial lease may permit a landlord to terminate the lease and seek possession in the event of a tenant's default).

For a breach to be deemed material and justify a unilateral termination of the lease, the breach must be one that "relates to a vital provision of the agreement, i.e. one that goes to the very substance or root of the agreement and cannot relate simply to a subordinate or incidental matter." G & J Holdings, 391 S.W.3d at 903 (internal quotation omitted). "It is well settled in Missouri that '[w]hether a breach is material or immaterial is a question of fact.'" Premier Golf, 282 S.W.3d at 873 (internal quotation omitted). "To establish a prima facie case of breach of lease, a plaintiff must establish the existence of a valid lease, mutual obligations arising under the lease, that defendant did not perform, and that plaintiff was thereby damaged by the breach." G & J Holdings, 391 S.W.3d at 901 (internal quotation omitted).

Here, the trial court found CSL Plasma materially breached the Lease such that CP3 was free to declare CSL Plasma in default, terminate the Lease, and seek unlawful detainer. Specifically, the trial court found CSL Plasma breached Sections 5 and 23 of the Lease because the conduct of its Invitees in the Common Area of the Shopping Center demonstrated that CSL Plasma used or permitted the use of the Leased Premises in a manner that created a nuisance, disturbed other tenants, and permitted the accumulation of trash and the release of hazardous substances. On appeal, both CP3 and CSL Plasma challenge the trial court's interpretation of the terms of the Lease. Because the evidence of breach centers on the conduct of the Invitees in the

8

Common Area, the core issue on appeal is CSL Plasma's responsibility for the conduct of its Invitees in the Common Area of the Shopping Center under the terms of the Lease.

We interpret the terms of a commercial real estate lease according to the rules of contract construction. AB Realty One, 466 S.W.3d at 729 (internal citation omitted). "The primary rule of contract interpretation is to determine the parties' intent and give effect to that intent." Id. (internal citation omitted). "If a commercial lease agreement, like any other contract, is unambiguous, we determine the intent of the parties by giving the words they used in their agreement 'their plain, ordinary, and usual meaning.'" Morris Branson Theatre, LLC v. Cindy Lee, LLC, 472 S.W.3d 635, 639 (Mo. App. S.D. 2015) (quoting AB Realty One, 466 S.W.3d at 730); see also Jerseyville Mall, L.L.C. v. Shop 'N Save Warehouse Foods, Inc., 633 S.W.3d 523, 526 (Mo. App. E.D. 2021) (internal citation omitted). "Only when the language is ambiguous and not clear will we resort to extrinsic evidence to resolve a contractual ambiguity." Morris Branson Theatre, 472 S.W.3d at 639 (quoting AB Realty One, 466 S.W.3d at 730); Miller, 67 S.W.3d at 621 (noting "[w]here a lease is unambiguous, this court will look only to the actual text of the agreement for evidence of the parties' intentions" when interpreting a commercial lease to determine whether the landlord or the tenant had the duty to pay for parking lot repairs).

The Lease at issue defines the Leased Premises as the 9,000 square feet of space in the Shopping Center where CSL Plasma operates its blood plasma donation center. The Lease *separately* defines the Common Area of the Shopping Center, which includes the parking lot and sidewalks outside the Leased Premises. The Lease provides separately for the oversight and control of the Leased Premises versus the Common Area. Section 10 provides that "[t]he [C]ommon [A]rea shall be subject to the exclusive control and management of Landlord[.]" Section 5 states that CSL Plasma "shall not use nor permit the Leased Premises to be used for

9

any purpose other than: a blood plasma collection center[.]" The focus of this appeal is on the following language: "[CSL Plasma] will not use, or permit the use of the Leased Premises, in any such manner that will tend to create a nuisance or tend unnecessarily to disturb other tenants or occupants of the Shopping Center or tend to injure the reputation of the Shopping Center." Relatedly, Section 23 provides that CSL Plasma "shall not . . . permit the escape, disposal, or release from the Leased Premises or the Shopping Center or transport thereto or therefrom, any hazardous, toxic, or harmful substances (collectively referred to as "Hazardous Substances"), except as necessary for the authorized use in its Lease[.]"

CSL Plasma maintains that the only evidence adduced at trial relating to the alleged breach of Lease Sections 5 and 23 describes the conduct of Invitees within the Common Area. Summarily, the evidence showed Invitees were bleeding and leaving bloody bandages on the sidewalks and parking lot of the Common Area after donation. The record also contains evidence that Invitees were loitering, panhandling, and sleeping in the Common Area, were involved in verbal and physical altercations in the Common Area, and were engaged in conduct that negatively impacted the Shopping Center and its reputation. CSL Plasma reasons that the evidence adduced at trial fails to establish any breach by CSL Plasma of its duties under the Lease because the evidence reveals only conduct of Invitees in the Common Area, the control and management of which is expressly delegated to CP3 under the plain language of Section 10. Indeed, CSL Plasma suggests the Lease assigns it no duty to control the conduct of Invitees in the Common Area. CP3 acknowledges that the evidence of breach relates only to the conduct of Invitees within the Common Area, and not any conduct of CSL Plasma that occurred within the confines of the Leased Premises. But CP3 contends that Section 10, although delegating exclusive management and control of the Common Area to itself, does not release CSL Plasma

10

from its concurrent responsibility for the conduct of its Invitees occurring outside the defined space of the Leased Premises. Rather, CP3 maintains that the language found in Sections 5 and 23 addressing CSL Plasma's use and tenant conduct within the Leased Premises is sufficiently broad to hold CSL Plasma responsible for the conduct of its Invitees in the Common Area. We are not persuaded by CP3's expansive interpretation of the operative Lease provisions.

We begin our interpretation of the Lease by "examining the plain language of the agreement to determine whether it clearly addresses the issue at hand." Jerseyville Mall, 633 S.W.3d at 526 (internal citation omitted). In this case, the Lease was finalized only after substantial, long-term negotiations and due diligence between sophisticated business entities. Neither CSL Plasma nor CP3 contend the Lease is ambiguous as to the assignment of responsibility for the conduct of Invitees in the Common Area. See State ex rel. Greitens v. Am. Tobacco Co., 509 S.W.3d 726, 737 (Mo. banc 2017) (quoting Morelock–Ross Props., Inc. v. English Vill. Not–for–Profit Sewer Corp., 308 S.W.3d 275, 280 (Mo. App. S.D. 2010)) (noting "silence in a contract does not create an ambiguity, especially when both parties are 'sophisticated bargainers'"); Cf. Adbar, L.C. v. New Beginnings C-Star, 103 S.W.3d 799, 802 (Mo. App. E.D. 2003) (finding the doctrine of commercial frustration was not availing in a commercial lease dispute where the lease contained no provisions for the tenant's foreseeable funding issues).

We examine the plain language of the Lease to determine the parties' intent and give effect to that intent. See Jerseyville Mall, 633 S.W.3d at 526 (internal citation omitted); Morris Branson Theatre, 472 S.W.3d at 639 (citing AB Realty One, 466 S.W.3d at 730). When reviewing Section 5, we note the following restrictions on CSL Plasma's use of the Leased Premises: CSL Plasma may not use the Leased Premises for any purpose other than a blood

11

plasma donation center; CSL Plasma may not use or permit the Leased Premises to be used in a manner that tends to create a nuisance, tends to unnecessarily disturb other tenants or occupants of the Shopping Center, or tends to injure the reputation of the Shopping Center. Correspondingly, Section 23 prohibits CSL Plasma from permitting the escape or release of any hazardous, toxic, or harmful substances from the Leased Premises or the Shopping Center, or from permitting undue accumulation of garbage, trash, rubbish, and other refuse.

The core of the parties' conflict on appeal is their contrasting interpretation of the word "permit" as used in the Lease. The parties disagree how broadly to construe the meaning of the term "permit" as used in the Lease, specifically where the Lease prohibits CSL Plasma from "*permit[ting]* the use of the Leased Premises" to cause a nuisance and disturb other tenants or occupants of the Shopping Center in Section 5 or "*permit[ting]* the escape" of hazardous substances in Section 23. (Emphasis added). We note the Lease does not provide a definition of the term "permit" as used in the Lease. Therefore, applying fundamental principles of contract interpretation, we must give the words in the Lease "their plain, ordinary, and usual meaning." Morris Branson Theatre, 472 S.W.3d at 639 (citing AB Realty One, 466 S.W.3d at 730). "The term 'permit' means 'to give permission; to authorize; to allow by silent consent, or by not prohibiting[.]'" Egenreither ex rel. Egenreither v. Carter, 23 S.W.3d 641, 644 (Mo. App. E.D. 2000) (citing Monteer v. Prospectors Lounge, Inc., 821 S.W.2d 898, 900 (Mo. App. W.D. 1992)) (using the dictionary definition to discuss the meaning of "permit" and "allow" in strict-liability ordinances, including non-liability under a liquor-license ordinance prohibiting disorderliness where the bartender attempted to end the dispute and had not acquiesced to the misconduct). The term "permit" implies a measure of control *by the responsible party* over the action allowed, authorized, consented to, or not prohibited. See id. (emphasis added). Here, CP3 urges us to

construe "permit" broadly in the Lease to impose an affirmative obligation on CSL Plasma, as the responsible party, to control the conduct of its Invitees before and after they have left the limited boundaries of the Leased Premises and entered the Common Area of the Shopping Center. CP3 maintains that CSL Plasma should somehow stop Invitees from removing and discarding their bloody bandages on the sidewalks and parking lot following their plasma donation or from engaging in behaviors that disrupt other shoppers and tenants—or otherwise be held liable for such conduct. Indeed, we appreciate and take as true the gravity of the facts found by the trial court regarding such egregious conduct by Invitees. See AB Realty One, 466 S.W.3d at 728 (citing Moore, 132 S.W.3d at 242) (noting we defer to the trial court's factual findings). Nevertheless, we must construe the contract as a whole, "viewed from end to end and corner to corner[.]" Morris Branson, 472 S.W.3d at 640 (internal quotation omitted). Having thoroughly reviewed the provisions of the Lease, we disagree with the trial court's interpretation of Sections 5 and 23 and its corresponding assignment of responsibility for such conduct to CSL Plasma.

Use provisions like those set forth Section 5 and Section 23 generally address tenant use and conduct *within* the leased premises. Indeed, we note that these sections of the Lease are entitled "Use of Leased Premises" and "Tenant Conduct in Leased Premises," respectively. Section 5 begins by limiting CSL Plasma's use of the Leased Premises to its business as a blood plasma donation center. See, e.g., Crestwood Plaza, Inc. v. Kroger Co., 520 S.W.2d 93, 97 (Mo. App. S.L.D. 1974) (internal citation omitted) ("When a lease expressly stipulates a single-purpose use, a lessee is bound thereby . . . [and] [a]bsent other express restrictions, a lessee is free to use the premises in any lawful manner."). A landlord may restrict a tenant's use of a leased premises, such as denying a competing business in a shopping center or disallowing the use of flammable material, machines that cause vibration, noxious odors and the like, which

13

could endanger the building and disturb other tenants, though "[c]lauses purporting to limit a tenant's use often create difficulty, and cases construing these clauses are at times difficult to reconcile." MILTON R. FRIEDMAN, FRIEDMAN ON LEASES 1522–24 (4th ed. 1997).

In determining whether CSL Plasma "permitted" the conduct of Invitees in the Common Area as alleged, we cannot ignore the Lease's clear designation of control over the Common Area to CP3. See Jerseyville Mall, 633 S.W.3d at 526 (internal citation omitted) ("A construction that gives a reasonable meaning to each term and harmonizes all provisions is preferred over a construction that renders some provisions without function or sense."). Section 10 states that "[t]he [C]ommon [A]rea shall be subject to the exclusive control and management of [CP3.]" The plain language of the Lease clearly defines the relative responsibilities and obligations of the tenant and landlord. While Sections 5 and 23 address CSL Plasma's use and conduct within the Leased Premises, the Lease assigns exclusive control over the Common Area—which lies outside the Leased Premises—to CP3. See Morris Branson, 472 S.W.3d at 640 (internal quotation omitted) (interpreting a commercial lease to find that the leased premises was restricted to the interior portions of the building as described in the lease); Fuller v. TLC Prop. Mgmt., LLC, 402 S.W.3d 101, 105–06 (Mo. App. S.D. 2013) (en banc) (interpreting a residential lease to find that the leased premises was strictly defined as the apartment unit itself and thus an injury in the parking lot was one not "occurring on or about the [leased] [p]remises" but rather in a common area such that the landlord was liable). While the matter before us does not involve a personal injury claim, we find the guidance of premises liability cases instructive as the courts look to the operative lease provisions to determine liability. In these cases, as an exception to general non-liability for injuries caused by defects on the premises, landlords are consistently held liable for injuries occurring in common areas where the lease assigns them

14

control over the area and that control has some relationship to the situation which produced the injury. See McKinney v. H.M.K.G. & C., Inc., 123 S.W.3d 274, 282 (Mo. App. W.D. 2003) (internal citations omitted); see also Dunlap v. Howard, 629 S.W.2d 664, 667 (Mo. App. E.D. 1982) (finding in a premises liability case involving an injury at a service station that the absence of lease provisions establishing the owner oil company's control or right to control operations was dispositive on the issue of liability).

The term *"exclusive"* in Section 10 is unambiguous. See Morris Branson Theatre, 472 S.W.3d at 639 (quoting AB Realty One, 466 S.W.3d at 730). We are persuaded that the grant of *"exclusive"* control and management over the Common Area in Section 10 is dispositive of the issue of control over Invitees in the Common Area. The reservation of *"exclusive"* control to the Landlord contravenes CP3's contention that CSL Plasma is required to oversee or control conduct in the Common Area. This reservation of control further undermines CP3's argument that it lacks authority to eject, ban, or otherwise exert control over disruptive Invitees in the Common Area because tenants and invitees of the Shopping Center are granted a *"nonexclusive"* right to enjoy use of the Common Area. See, e.g., Goldfinch Enters., Inc. v. Columbia W, L.P., 159 S.W.3d 866, 867 (Mo. App. W.D. 2005) (finding a commercial landlord did not violate the lease by dedicating several parking spaces to a particular retail tenant where lease granted the landlord "exclusive control and management" over the common areas, which included the parking lot, as well as the authority to change the size, area, or arrangement of parking). Exclusivity has priority over nonexclusivity and imparts control over the Common Area solely to CP3. Section 10 empowers CP3 to issue rules and regulations regarding the Common Area. This authority is consistent with CP3's exclusive control of the Common Area. The evidence at trial established that CP3 never issued any rules or regulations. Reading all of

15

the relevant provisions together as we must, Section 10 limits the overly broad interpretation of Sections 5 and 23, upon which CP3 relied as a basis for terminating the Lease and pursuing this action for unlawful detainer. See Morris Branson, 472 S.W.3d at 640 (internal citation omitted).

CP3 calls our attention to various corrective measures taken by CSL Plasma following CP3's complaints about the conduct of the Invitees in the Common Area. In response to the concerns raised by CP3, CSL Plasma instructed its Invitees to not remove their bandages in the Common Area and not to loiter in the Common Area. CSL Plasma changed the way its employees bandaged Invitees after donation, cleaned up discarded bandages and blood from the Common Area, installed video cameras to record footage in front of the Leased Premises, and exercised its deferral process to deny problematic repeat donors access to the Leased Premises. CP3 maintains that CSL Plasma's efforts to address the issue of Invitee misconduct by implementing such measures supports the trial court's finding of CSL Plasma's obligation under Sections 5 and 23 of the Lease to control Invitee conduct occurring outside of the Leased Premises. We find this argument unavailing because, as CSL Plasma correctly notes, extrinsic evidence of CSL Plasma's voluntary actions does not modify the duties assigned to CSL Plasma under the plain language of the Lease. See id. at 639 (quoting AB Realty One, 466 S.W.3d at 730) (noting extrinsic evidence will not be used to interpret a contract unless the language is found to be ambiguous); see also Twin River Constr. Co., Inc. v. Pub. Water Dist. No. 6, 653 S.W.2d 682, 690 (Mo. App. E.D. 1983) (internal citation omitted) (noting agreements to modify an existing agreement require all of the elements of contract formation, including consideration). Indeed, CSL Plasma explains that it undertook such actions voluntarily as a good neighbor to assist its fellow tenants and CP3 with a recognized problem—and did not act pursuant to any assigned responsibility for Invitee conduct in the Common Area under the Lease.

16

CP3 alternatively, and more persuasively, reasons that remedial action taken by CSL Plasma *within* the Leased Premises—such as adjusting its bandaging method, educating its Invitees, and deferring plasma donations from problematic Invitees—is evidence of CSL Plasma's breach of its obligation to use the Leased Premises in a way that did not create a nuisance, disturb other tenants, or permit the accumulation of trash and release of hazardous substances in violation of Sections 5 and 23. In other words, CP3 posits that CSL Plasma's efforts occurring *within* the Leased Premises to address CP3's complaints demonstrate CSL Plasma's acknowledgement of its duty to control the conduct of its Invitees under Sections 5 and 23, even when Invitee conduct occurred *outside* the Leased Premises. In this way, CP3 proposes that the grant of exclusive control and management of the Common Area to it under Section 10 is not dispositive of whether the Lease imposed a duty on CSL Plasma to control Invitee conduct in the Common Area. CP3 argues that Section 10 exists in harmony with the limitations imposed on a tenant's use of the Leased Premises under Sections 5 and 23, and that Section 10 reasonably cannot be construed as creating a bright line absolving CSL Plasma from any responsibility with respect to the conduct of its Invitees occurring outside the defined space of the Leased Premises.

Looking at the Lease provisions in their entirety, we are not persuaded that a reasonable interpretation of the Lease that gives meaning to all provisions, including Section 10, places responsibility for the conduct of Invitees in the Common Area squarely on the shoulders on CSL Plasma. Accordingly, we reject CP3's suggestion that the record before us demonstrates that CSL Plasma breached "a vital provision . . . that goes to the very substance or root of the agreement[.]" G & J Holdings, 391 S.W.3d at 903 (internal quotation omitted); see also Jerseyville Mall, 633 S.W.3d at 526 (citing Chochorowski v. Home Depot U.S.A., 404 S.W.3d

220, 229 (Mo. banc 2013)) ("Missouri courts construe a contract as a whole so as not to render any terms meaningless."). CSL Plasma contracted that it would use the Leased Premises solely for the purposes of operating a blood plasma donation center. The record shows that CSL Plasma conducted its business consistent with its obligation to operate a blood plasma donation center. Critical to our analysis, CP3's allegations of breach are premised solely on the conduct committed within the Common Area, and not within the Leased Premises. Similarly, CP3's allegations of breach are premised solely on the conduct of Invitees and not the conduct of agents or employees of CSL Plasma.

The trial court's judgment of unlawful detainer is premised upon its interpretation of the Lease which imposes a duty on CSL Plasma to control the conduct of its Invitees before and after they exit the Leased Premises and enter the Common Area. We fully grasp the concern raised by CP3 and other tenants of the Shopping Center regarding the presence of blood and bloody bandages found discarded in the Common Area of the Shopping Center as well as the evidence of disruptive conduct of the Invitees in the Common Area. But even assuming that blood is a hazardous substance under the terms of the Lease, the presence of the blood and bandages in the Common Area results solely from conscious, though misguided, choices of persons not under the control of CSL Plasma. Short of holding Invitees inside the Leased Premises for multiple hours after donation to allow for the blood in the puncture wound to completely coagulate and seal the wound so that blood could not possibly "escape" from their punctured arms, we fail to see how CSL Plasma could wholly eliminate problems caused by the conscious and deliberate choice of donors to remove and discard their bloody bandages in the Common Area. Additionally, we reject as unreasonable an interpretation of "permit" that would make CSL Plasma strictly liable for the disruptive and abhorrent behavior exhibited by some

18

Invitees in the Common Area of the Shopping Center either before entering or after leaving the Leased Premises. Notably, CP3 identifies no judicial authority in which a commercial tenant has been held liable under its lease for the actions of its invitees in a common area that is under the exclusive management and control of the landlord. See e.g., Egenreither, 23 S.W.3d at 644 (citing Monteer, 821 S.W.2d at 900) (discussing non-liability in a case involving a liquor-license ordinance where the evidence showed the bar owner had not improperly "allowed" disorderliness on the premises given that he attempted to end the dispute and had not acquiesced to the conduct).

We concur with CP3 that the lease prohibition against permitting the use of the Leased Premises in a manner that tends to create a nuisance does not require proving a public or private "nuisance" as a legal term of art. It is well recognized that "[l]ess precise language may be effective between businesses of equal power and sophistication." Milligan v. Chesterfield Vill. GP, LLC, 239 S.W.3d 613, 616 n.3 (Mo. App. S.D. 2007) (citing Purcell Tire & Rubber Co., Inc. v. Exec. Beechcraft, Inc., 59 S.W.3d 505, 508 (Mo. banc 2001); Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 338 n.4 (Mo. banc 1996)) (noting precise legal terms of art like "negligence" and "fault" need not be included in a contract negotiated at arm's length between business contacts in order to limit liability effectively); see also McDonald's Corp. v. Sandbothe, 814 S.W.2d 665, 670 (Mo. App. E.D. 1991) (noting we do not construe a lease provision against the drafter where the agreement was executed following extensive arms-length negotiations as evidenced by interlineation, deletions, and additions). This case involves sophisticated business entities and a substantially negotiated lease, thus we apply the commonly understood meaning of the term "nuisance." See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH

19

LANGUAGE UNABRIDGED 1548 (2002) (defining nuisance as "harm, injury" and "an offensive, annoying, unpleasant, or obnoxious thing or practice").

The judicial authorities offered by CSL Plasma regarding liability for nuisances caused by third-parties are informative in ascertaining the intent of the contracting parties and support our interpretation of the Lease. See, e.g., City of St. Louis v. Varahi, Inc., 39 S.W.3d 531, 537–38 (Mo. App. E.D. 2001) (finding a hotel was not liable for the nuisance of prostitution in and around the hotel in part because, despite the hotel's three-hour rental policy, the hotel's knowledge of the nuisance was insufficient to impose liability absent evidence that the prostitutes were agents or employees or that the hotel had control over them); Grommet v. St. Louis Cnty., 680 S.W.2d 246, 252–53 (Mo. App. E.D. 1984) (finding a school district was not liable for the nuisance of cars being driven on nearby private property, contractors overspreading salt on the streets, and young people hosting loud parties where the plaintiffs proved no responsibility over or acquiescence by the school district to the actions of the third-party drivers, contractors, or partiers). CP3 contends that those cases are distinguishable because here, unlike in those cases, CSL Plasma had notice and control over the third-parties' nuisance activities. While CSL Plasma may have had notice of the complained of Invitee conduct, as explained above, we disagree that the Lease extended or delegated any control to CSL Plasma over the conduct of the Invitees in the Common Area. We simply cannot ignore the plain terms of the Lease which grant *exclusive* control and management over the Common Area to CP3. Moreover, evidence in the record shows that CP3 knew of and exercised its duties by arranging to have the Common Area cleaned and maintained and contracting with a third-party to have the Common Area patrolled by security. While CSL Plasma lacked any authority or contractual obligation to control the conduct of its Invitees before or after they left the Leased Premises and

20

entered into the Common Area of the Shopping Center, CP3 did not. We agree that the Invitee conduct described by CP3 likely would constitute a nuisance under the terms of the Lease. But critically, the record does not contain evidence that CSL Plasma operated the plasma donation center in its Leased Premises in a way that constituted a nuisance or otherwise materially violated the Lease. The underlying conduct forming the basis of the trial court's judgment that CSL Plasma materially breached the Lease and its corresponding judgment for unlawful detainer stem solely from the conduct of Invitees before or after entering the Leased Premises. Whether the allegations of material breach were premised upon permitting the escape of blood as an alleged hazardous material into the Common Area or permitting of the disturbance and reputational injury to CP3 or other shoppers and tenants, these allegations do not involve the acts or conduct of any agent or employee of CSL Plasma.

In summary, the plain language contained in Sections 5 and 23 restrict CSL Plasma's use of and conduct *within the Leased Premises*. This restriction does not extend to the Common Area where the problematic conduct was identified and over which the Lease assigns exclusive control to CP3. We reject the argument that the plain meaning of the term "permit" as used in Sections 5 and 23 somehow abrogates the exclusivity of CP3's control and management of the Common Area as set forth in the Lease, or can be broadly construed to impose liability on a tenant for the behavior of third-party invitees which occurs outside of the tenant's leased space. See Morris Branson, 472 S.W.3d at 640; Fuller, 402 S.W.3d at 104; see also FRIEDMAN, FRIEDMAN ON LEASES at 1461 ("Words in common usage are construed as they are used[;] [t]hey will not be construed in the broadest sense possible where this would give them a meaning alien to popular usage.").

21

We are not unsympathetic to the problems caused by the Invitees' conduct to patrons and other tenants of the Shopping Center. To the contrary, the conduct described in the evidence presented is troublesome. However, CSL Plasma is not responsible or liable for such conduct under the plain language of the Lease. The parties could have contracted to address third-party invitee conduct differently. CP3 undertook to visit and observe CSL Plasma's business operation at another location before entering the Lease. We again note that both parties to the lease are sophisticated businesses. CP3 could have negotiated to plainly impose a duty on CSL Plasma over its business Invitees even in the Common Areas. But it did not. CP3 now tries to bootstrap the "permitted" language of Sections 5 and 23 to extend CSL Plasma's obligations beyond the boundary of the Leased Premises. We cannot countenance such a strained interpretation of the Lease. See Jerseyville Mall, 633 S.W.3d at 528 (internal quotation omitted) ("[T]he general rule of freedom of contract includes the freedom to make a bad bargain."). It is a "fundamental principle that parties are free to contract as they wish," and our role simply is to enforce the contract as written. Amalaco, LLC v. Butero, 593 S.W.3d 647, 651–52 (Mo. App. E.D. 2019) (citing Util. Serv. & Maint., Inc. v. Noranda Aluminum, Inc., 163 S.W.3d 910, 913 (Mo. banc 2005)) (noting a landlord was free to exercise its right to terminate a lease and demand possession where the tenant breached the provision prohibiting illegal activity by subletting through Airbnb).

Because the plain language of the Lease does not support finding CSL Plasma materially breached the Lease through the conduct of its Invitees in the Common Area, we find the trial court erred as a matter of law in interpreting the Lease and entering judgment for unlawful detainer. See AB Realty One, 466 S.W.3d at 728 (internal citations omitted). Point One is

22

granted.  Because we reverse and remand the case to the trial court on Point One, any discussion of the remaining points on appeal is now moot.  CP3's motion for attorneys' fees is denied.

Conclusion

The judgment of the trial court is reversed.  We remand the case to the trial court for further proceedings consistent with this opinion.

_____
KURT S. ODENWALD, Presiding Judge

Kelly C. Broniec, J., concurs.
John P. Torbitzky, J., concurs.

23